FILED
IN CLERK'S OFFICE

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

IN P II: 03

U.S. DISTRICT COURT
DISTRICT OF MASS.

DIANNE MARLON,　　　　　　　　　）
　　　Plaintiff　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
VS.　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）　　CIVIL ACTION NO. 01-12199-FHF
WESTERN NEW ENGLAND　　　　　　　）
COLLEGE,　　　　　　　　　　　　　）
　　　Defendant　　　　　　　　　　　）

## Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment

Plaintiff Diane Marlon ("Marlon") respectfully urges that the court deny defendant's

motion for summary judgment for the reasons set forth hereafter.

## I.　　STATEMENT OF FACTS

Marlon disputes defendant's statement on page 5 of its memorandum that "Plaintiff was

issued . . . the opportunity to record her classes via voice-activated recorder," and challenges

defendant to support the truth of this allegation anywhere on the record. Contrary to this

representation, although (1) defendant's own Director of Student Disability Services, Bonnie

Alpert, Ph.D. ("Alpert"), found that Marlon had "provided the College with the necessary

documentation and . . . made requests that are consistent with Section 504 of the Rehabilitation

Act of 1973 and the American's [sic] with Disabilities Act of 1990" and anticipated needing "the

use of voice recognition software for exam and paper," Defendant's Exhibit ("DE")[1] 27, (2) the

---

[1] Exhibits attached to Defendant's Memorandum are not re-submitted herewith, but are designated by the prefix "DE," followed by the number assigned by defendant. Exhibits referred to herein which were not submitted by defendant will be designated merely as "Exhibit" and are

defendant had purchased some such equipment and found it "very helpful for some students," and (3) Alpert recommended that Marlon be able to use it, Exhibit 1, Alpert Deposition, p. 85, lines 3-10, defendant, through Assistant Dean Nancy Sykes ("Sykes"), ultimately refused to permit Marlon to use such software, claiming that it was "too easy to cheat" with it.[2] DE9 (Plaintiff's Answers to Interrogatories), p. 10.

Marlon does not quarrel with the additional "facts" designated in defendant's narrative, except insofar as those facts are incomplete and, in conjunction with additional material facts developed through discovery, do not justify summary judgment.

Marlon was admitted to Western New England College law school in 1999, after more than fifteen years as a paralegal, working in a number of complicated legal fields, including complex litigation and medical malpractice. DE9, pp. 3-4. In the fall of her first year, she began to suffer from right shoulder, arm and hand pain, with a marked limited range of motion in the right shoulder. She felt a numbness, which became increasingly worse from continual writing in law school. Over the course of the school year she was variously diagnosed as having adhesive capsulation, kyphosis, cervical neuritis, cervicobrochial syndrome and carpal tunnel syndrome. *Id.*, p. 5. In addition to her physical symptoms she began to suffer from anxiety and severe depression, which affected her ability to concentrate. *Id.*

Despite these ailments, after she was transferred from full-time to part-time status, she succeeded in passing her two-hour mid-term examinations. By the end of the year, her

---

submitted herewith.

[2]Significantly, defendant cannot claim that Marlon's request was unreasonable or posed a "hardship" of any kind upon defendant or its academic program in that it subsequently allowed at least one other student to use such software. Exhibit 2, Deposition of Mary Van Houten, p. 24, line 2 - p. 25, line 1.

performance in Lawyering Process led the professor, Beth Cohen ("Cohen"), to recommend that Marlon be named to Law Review. However, Marlon failed to achieve a passing grade in her four-hour final examinations and was notified in June 2000 that she would be dismissed from the school on the basis of academic standards.

Dean Arthur Leavens ("Leavens") actively discouraged her from trying to seek reinstatement through the Academic Standards and Student Petitions Committee ("the Committee"). On the other hand, professor Richard Cole ("Cole") encouraged her to seek an accommodation for her hand. When she returned to Leavens he continued to discourage her, and it was through information provided by an outside party that she learned that the defendant actually offered disability services to students. DE9, pp. 8-9.

On July 12, 2000, by telephone, Marlon spoke with Alpert. They met at Alpert's office, where Marlon discussed her disabilities, specifically carpal tunnel syndrome and depression, and explained that she believed these disabilities caused her to perform poorly on her finals. She presented documentation from Benjamin Liptzin, M.D. ("Liptzin"), her treating psychiatrist, who diagnosed major depression and panic disorder, and Vijay Patel, M.D. ("Patel"), her treating general physician, who diagnosed carpel tunnel syndrome. *Id.*, p. 9, Alpert, whose duties include making sure that students receive proper accommodations and making sure that student's receive support services, Exhibit 1, p. 8, line 22- p. 9, line 5, and whose jurisdiction covered all physical and mental disabilities, *id.*, p. 15, lines 12-23, agreed that Marlon was entitled to necessary accommodations, DE9, p. 9 and issued a "Faculty Notification of Student's Accommodations," DE27, which was never fully implemented.[3]

---

[3] Alpert's findings belie any suggestion by defendant that Marlon's disabilities were insufficiently documented. It was she who determined a student's limitations, by reviewing the

3

The Committee granted Marlon's petition for reinstatement, on the condition that she repeat the first year with the exception of Lawyering Process, DE13, without addressing the issue of accommodations. Sykes was designated by the defendant as the person in the law school responsible for Marlon's accommodations. Exhibit 1, p. 32, lines 7-20; Exhibit 3, Sykes Deposition, p. 14, line 10 - p. 17, line 5. Sykes had no training in administering programs for students with special needs and no, training or education in disability law. *Id.*, p. 11, line 24 - p. 12, line 22. Sykes had no written standards available to her upon which to base her decisions regarding accommodation of disabled students. *Id.*, p. 12, line 23 - p. 13, line 7; Exhibit 2, p. 9, lines 20-23.

Apart from its unjustified refusal to allow Marlon to use voice-activated software, the other accommodations afforded her by defendant were also wanting. For example, defendant did not provide a note-taker until nearly a month after classes had begun. D9, p. 10. The notes were insufficient in detail to be useful to Marlon, but when she asked Sykes what she might do to improve their quality, Sykes replied, "Nothing. It was too hard to get anyone to even take notes. I was lucky anyone would even do it." *Id.*[4]

As to the request for extended time to take exams, the accommodation actually given was a rest period from writing rather than extra time for the exam. Exhibit 2, p. 35, line 15 - p. 36,

---

documentation and carefully reading the diagnosis or how the disability impacts the student and puts her at a disadvantage if not provided proper accommodations. Exhibit 1, p. 16, line 4 - p. 17, line 6. She would intervene– whether with respect to the classroom environment or examinations– when she perceived from the documentation that the student would be at a disadvantage without accommodations. *Id.*, p. 17, lines 7-20. If the necessary information is not in the documentation, she would talk with the student and request that they get the information. *Id.*, p. 20, line 12 - p. 21, line 19.

[4]Sykes apparently never reviewed the notes given Marlon.  Exhibit 3, p. 30, lines 6-7.

4

line 18. It is not clear what standard the defendant applied to determine that a fifteen minute rest per hour was sufficient to address Marlon's disabilities.[5] Although these breaks may represent an effort, albeit meager, to address Marlon's carpal tunnel syndrome, they plainly did not address Marlon's limitations arising from her mental disabilities. Sykes never responded to the concerns Marlon expressed about the insufficiency of the fifteen minute breaks. DE9, p. 11.

Although Marlon again passed her two-hour mid-term examinations in January 2001, in May, 2001 she learned that she had not received passing grades on her final four-hour exams, which she attributed to having been given insufficient time for the exams. Once again she was informed that she could not pass into the second year. *Id.*

In June, Liptzin ordered a neuropsychological evaluation of Marlon. *Id.* The evaluation was conducted by Mark R. Elin, Ph.D. ("Elin"), who found that Marlon had "significant attention/concentration problems which will interfere with her capacity to encode, consolidate, and access information." He concluded that she has "a specific learning disability in reading, math, and spelling. This is a longstanding learning disability which has gone unnoticed." DE36, p. 4; Exhibit 4, Elin Letter to the Committee, p.4. He attributed Marlon's difficulties in law school to these findings, *id.*, p. 4, and identified specific accommodations necessary to address her disability, including double time to take examinations and a distraction-free environment for her examinations. *Id.*, p. 5. Patel also recommended that one and one-half to double the allotted time for her exams to accommodate her carpal tunnel syndrome. DE26.

---

[5]Sykes explained that the decision to permit Marlon a 15 minute rest every hour was "what her doctor had recommended" in a note from the doctor which she recalled having seen. Exhibit 3, p. 65, lines 4-17. The doctor's note actually reads, "breaks every 20 minutes." *Id.*, p. 66, lines 4-21; DE16. Sykes explained that 15-minutes per hour "seemed like a logical representation of what her doctor was recommending." *Id.*, p. 67, line 5 - p. 68, line 8.

Marlon petitioned the Committee for readmission a second time in the summer of 2001. To the Committee, which has broad latitude to prescribe whatever conditions it deems reasonable in readmitting a student, Exhibit 5, Deposition of James Gordon, p. 19, line 23 - p. 20, line 18, Marlon submitted medical evidence concerning her disabilities and need for accommodation from both Patel and Elin. DE9; DE26; Exhibit 4; Exhibit 6, Marlon Addendum to Petition dated 7/12/01. Marlon identified the following necessary accommodations: (1) double time to take examinations; (2) distraction free environment to take the examinations; (3) use of computer; (4) schedule tests at least two days apart; and (5) continue with note taker. She also identified six additional "benefits" which would address her disabilities: (1) taking classes where there is submission of a paper in lieu of a final examination; (2) option to submit papers in lieu of final examination; (3) circle multiple choice answers; (4) counseling in test-taking skills; (5) voice activated computer; and (6) extra rest times during examinations. Exhibit 6.

At the Committee hearing on Marlon's petition, Leavens inaccurately reported that Sykes *had* authorized Marlon to use voice-activated software. DE9, p. 12. Peter Adomeit ("Adomeit"), chair of the Committee considering this appeal, rejected the evidence that Marlon's disabilities compromised her ability to take examinations without accommodation on time constraints and concluded that she was merely unable to engage in legal analysis properly, Exhibit 7, Adomeit Deposition, p. 18, lines 2-8, because she lacked or had a difficult time with "higher cognitive abilities." *Id.*, p 28, lines 5-9. While he acknowledged that Marlon was able to perform "at a high level of integrative and analytic work" on shorter exams, *id.*, p. 48, lines 7-15, that she has ability in writing as demonstrated by her being recommended for law review, *id.*, p. 48, line 16- p. 49, line 24, that she impressed Cohen, *id.*, p. 50, lines 2-3, and that she performed better in class than

6

on her written exam for Cole, *id.*, lines 13-16, he was unable to explain the discrepancy between her demonstrated ability in the classroom and her poor performance in the four-hour written examinations. *Id.*, p. 51, lines 10-17.

The Committee denied Marlon's appeal, and she has brought this action, alleging that defendant illegally discriminated against her in failing reasonably to accommodate her disabilities and handicaps.

## II    ARGUMENT

### A.    Defendant is not entitled to summary judgment because there is sufficient evidence by which a reasonable finder of fact could conclude that she was disabled within the meaning of federal and state law.

Defendant seeks summary judgment on a premise which borders on the frivolous. Although it is plainly aware that Marlon has documented disabilities which interfere with one or more major life activities, it seeks to have the court rule that, as a matter of law, within the meaning of the relevant statutes. To defeat summary judgment, Marlon does not need to prove beyond doubt that she is disabled; she only needs to point to evidence on the record from which a reasonable fact-finder could conclude that she is disabled.[6]

As an institution of higher learning admitting members of the public, defendant is covered by the ADA and § 504. The court spelled out in *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 313 (D. Mass. 1997):

> Title III of the Americans with Disabilities Act, 42 U.S.C.A. § 12182 (1988), provides that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities,

_____

[6]Because defendant has treated all of Marlon's claims as equivalent to her Americans with Disabilities Act ("ADA") claim, she will not separately argue that she is "handicapped" within the meaning of the Rehabilitation Act of 1973 ("§ 504") or Mass. Gen. Laws ch. 93, § 103.

privileges, advantages, or accommodations of any place of public accommodation
. . . ." The Rehabilitation Act, 29 U.S.C.A. § 794(a)(as amended 1992), states that
"no otherwise qualified individual with a disability . . . shall, solely by reason of
her or his disability, be excluded from the participation in, be denied the benefits
of, or be subjected to discrimination under any program or activity receiving
Federal financial assistance." Both statutes apply to discrimination by educational
facilities in receipt of federal funds, see 42 U.S.C. § 12181(7)(J) and 29 U.S.C. §
794(b)(2)(A), and neither limits its prohibitions to discrimination in the
employment context.

The question is, then, whether Marlon a person protected by the ADA and related

statutes. To be entitled to such protection, she must put forth credible that she suffers from a

physical or mental impairment that "substantially limits one or more major life activities." 42

U.S.C. § 12102(2)(A). The record demonstrates that she suffers or has suffered from at least four

such impairments: specific learning disability; major depression; panic attacks; and carpal tunnel

syndrome. The relevant administrative agencies and courts have recognized that each of these

conditions may qualify as disabilities within the meaning of the statutes.

Marlon's specific learning disability, as diagnosed by Elin, Exhibit 4, DE36, and her

major depression and panic attacks, as diagnosed by Liptzin and Wayne Carpenter, Ph.D.,[7]

constitute qualifying impairments as defined by ADA regulations. A mental impairment as "any

mental or psychological disorder, such as . . . emotional or mental illness, and specific learning

disabilities." 29 C.F.R. § 1630.2(h)(2). *See also,* 34 C.F.R. § 104.3(j)(2)(i)(B) (implementing §

504); *Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 134 (D.Mass. 1997).

---

[7]Marlon objects to defendant's flagrant violation of the court's protective order under
which it was to alert counsel of its intent to make use of certain medical records obtained in the
course of discovery, including, specifically Liptzin's and Carpenter's records, which contain
personal information which should not have been made part of the public record. She will seek to
have these records impounded and to seek sanctions against defendant for this contumacious
conduct. Moreover she will forthwith seek to introduce as an impounded Exhibit 8, her initial
psychiatric evaluation by Liptzin, which corroborates her assertion that she suffers from major
depression and other mental illness.

The record also demonstrates that Marlon suffered from a physical disability, carpal tunnel syndrome, diagnosed by Dr. Patel. DE26.

Marlon must also show that these disabilities interfere with one or more major life activities, "those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. Pt. 1630.2(i), App; *see Whitney v. Greenberg*, 115 F. Supp. 2d 127, 131 (D.Mass. 2000). The record clearly demonstrates that these impairments have indeed interfered with Marlon's major life activities, including learning and working. DE9, p. 13. ADA regulations explicitly recognize learning and working as qualifying major life activities. 29 C.F.R. § 1630.2(i).

Defendant is not entitled to summary judgment.

**B.    Defendant is not entitled to summary judgment because there is ample evidence that it failed reasonably to accommodate Marlon when it had a duty to do so.**

Whittled down to essentials, defendant argues that even if Marlon was disabled, she cannot show that she was entitled to particular accommodations because defendant adequately accommodated her in view of the information it had about her needs. However, the record demonstrates that the defendant had notice of Marlon's needs and chose not to address them in a meaningful fashion.

In the first place, defendant's own Director of Student Disability Services recognized, on the basis of her review of medical documentation, that Marlon was entitled to use voice recognition software, to have a note taker and to have extended time on exams. DE27. That essentially constitutes an admission by defendant, *prima facie* evidence of the need for and reasonableness of such accommodations. There is no adequate explanation for defendant's failure to provide these other than its reckless disregard for the requirements of the law,

9

evidenced by its assignment of an individual to oversee implementation who had no background or training in dealing with disabilities, who had no written standards upon which to base her decisions and who had so little interest in whether certain proffered accommodations (the student notes) were adequate that she did not even read them.

Once defendant became aware of Marlon's need for accommodation, it had "a mandatory obligation under the ADA to engage in an interactive process with her to identify and implement appropriate reasonable accommodations." *Humphrey v. Memorial Hospital Associations*, 239 F. 3d 1128, 1137 (9th Cir. 2001), *citing Barnett v. U.S. Air*, , 228 F.3d 1105, 1114 (9th Cir. 2000); *see also Russell v. Cooley Dickinson Hospital, Inc.*, 437 Mass. 443, 457 (2002). Defendant's failure to engage in an interactive process once it had notice of plaintiff's need for accommodation precludes it from raising, that various accommodations would not have worked and gives rise to an inference of bad faith. *Taylor v. Phoenixville School District*, 174 F.3d 142 (3d Cir. 1999). Summary judgment is typically precluded under such circumstances. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 318 (3d Cir. 1999).

Defendant's callous disregard for its duties also preclude its efforts to shield itself from judicial scrutiny with the mask of academic freedom. Had defendant complied with the request of its Director of Student Disability Services in accommodating Marlon, the court might give some deference to its argument that it had a legitimate academic justification for dismissing Marlon when she failed her exams a second time. However the point is that Marlon's disabilities, without reasonable accommodation, prevented her from demonstrating her true capacity for legal reasoning during four hour written exams. Defendant denied Marlon a fair chance to be a lawyer by its disregard for the requirement of the law that her disabilities be reasonably accommodated. There is sufficient evidence for a fact-finder to conclude that defendant violated her rights under

10

the ADA, § 504 and Mass. Gen. Laws ch. 93, § 103.

## III.    CONCLUSION

For the foregoing reason, Marlon respectfully urges that the court deny defendant's

motion for summary judgment.

Respectfully submitted,

DIANE MARLON
By her attorney:

Dated: May 16, 2003

Robert LeRoux Hernandez
Six Pleasant St., Suite 513
Malden, MA 02148
(781) 321-8300
BBO No. 231920

### Certificate of Service

I, Robert LeRoux Hernandez, certify that I served the foregoing document on all counsel of
record by first class and electronic mail on May 16, 2003.

# Exhibits

1.  Deposition of Bonnie Alpert, Ph.D., pp. 1, 8-9,15-17, 20-21, 85, 91

2.  Deposition of Mary Van Houten, pp. 9, 24- 25, 35-36

3.  Deposition of Nancy Sykes, pp. 11-17; 30; 65-68

4.  Letter of Mark R. Elin, Ph.D., to the Academic Standards Committee

5.  Deposition of James Gordon, pp. 19-20.

6.  Marlon Addendum to Petition Dated 7/12/01 for an Exception to the Rules for Academic Dismissal

7.  Deposition of Peter Adomeit, pp.18, 28, 31-32, 48-51

8.  Initial Psychiatric Evaluation by B. Liptzin, M.D. (Reserved Pending Motion to Impound)

# EXHIBIT 1

BONNIE ALPERT
9/19/2002

1          FOR THE COMMONWEALTH OF MASSACHUSETTS

2    Hampden: ss                District Court Division

3                              C.A. No. 01-12-199-FHF

4    * * * * * * * * * * * * * * * * * * * * * * * * * *

5    DIANNE MARLON                        *

6         Plaintiff,                      *

7              vs.                        *

8    WESTERN NEW ENGLAND COLLEGE          *

9         Defendant,                      *

10   * * * * * * * * * * * * * * * * * * * * * * * * * *

11

12

13          DEPOSITION OF:  BONNIE ALPERT

14            CATUOGNO COURT REPORTING

15               1414 Main Street

16          Springfield, MA  01144-1011

17       September 19, 2002       10:15 a.m.

18

19

20

21

22

23             Rita I. Steinke

24            Shorthand Reporter

BONNIE ALPERT
9/19/2002

Page 6

1    Q.    In what capacity?
2    A.    I'm Director of Student Disability
3    Services.
4    Q.    And how long have you held that
5    position?
6    A.    I am going on my sixth year in
7    July.
8    Q.    Where did you obtain your EDD?
9    A.    From UMASS, Amherst.
10   Q.    When did you graduate?
11   A.    In '92.
12   Q.    Do you also hold a masters?
13   A.    Yes, I do.
14   Q.    Where did you obtain that?
15   A.    University of Vermont.
16   Q.    When was that?
17   A.    In '86.
18   Q.    What was your masters?
19   A.    Counseling psychology.
20   Q.    Where did you do your undergraduate
21   work?
22   A.    The University of Vermont.
23   Q.    When did you graduate?
24   A.    1983.

Page 7

1    Q.    What was your major?
2    A.    English.
3    Q.    As to your EDD, what is your area
4    of specialty?
5    A.    Counseling psychology.
6    Q.    Have you worked for Western New
7    England prior to your appointment as director
8    of --
9    A.    No.
10   Q.    Where did you work before?
11   A.    I taught as an adjunct faculty at
12   the University of Massachusetts in Amherst.
13   Q.    What did you teach?
14   A.    I taught counseling psych classes,
15   head psych classes and I supervised guidance
16   counselors.
17   Q.    And when was that?
18   A.    That was after I received my
19   doctorate in '92.
20   Q.    Prior to that where did you work?
21   A.    I was getting my degree, so I had a
22   teaching assistantship and I worked at the
23   Center for Learning Disabilities at the
24   University.

Page 8

1    Q.    University of Massachusetts?
2    A.    Yes.
3    Q.    I should have said this earlier.
4    Have you ever been deposed before?
5    A.    Yes. Once.
6    Q.    Well, we have to use full words so
7    they can be properly recorded. And I will
8    always ask you to just wait until I finish my
9    question before you answer. If you don't
10   understand a question, just let me know so I can
11   rephrase it.
12   A.    Okay.
13   Q.    You say you were deposed before.
14   In relation to what?
15   A.    A student that I work with was
16   having a legal issue with an insurance company
17   and I was just a witness. Just some of his
18   current concerns. It had nothing to do with the
19   college.
20   Q.    Have you ever testified in court?
21   A.    No.
22   Q.    What are your duties as Director of
23   Disability Services?
24   A.    Mostly administrative. To make

Page 9

1    sure that students receive proper
2    accommodations. And also to make sure that they
3    are receiving the support services that they
4    need in order to provide the most educationally
5    supportive environment.
6    Q.    To whom do you report?
7    A.    Dr. Jerry Hirsch, vice-president.
8    Q.    Is he designated as vice-president
9    for some --
10   A.    For the whole college of academic
11   affairs.
12   Q.    For the whole college.
13         I assume he reports to the
14   president?
15   A.    Umh-humh.
16   Q.    Yes?
17   A.    Yes.
18   Q.    Do you have any persons who report
19   to you?
20   A.    I do. I have an assistant director
21   and another part-time employee.
22   Q.    That part-time employee is
23   clerical?
24   A.    It is a combination of clerical and

3 (Pages 6 to 9)

BONNIE ALPERT
9/19/2002

Page 14

1 attorney Jeanie Kincaid has presented on issues
2 that were on disability in higher education
3 settings.
4    Q.    The Compliance Guide is a Health
5 and Human Services' Guide?
6    A.    In some respects it is more of a
7 disability services guide, you know, dealing
8 with issues in both the federal and state issues
9 in relationship to the ADA and disabilities.
10    Q.    Do you know who publishes it?
11    A.    It is called L -- they just called
12 me yesterday. I think it is LDA, but I don't
13 know. I can get you that information.
14    Q.    Okay.
15    A.    Are you writing that down or should
16 I? I guess I will.
17    Q.    Is this compliance guide
18 periodically published or has it been standard
19 for a number of years now?
20    A.    It's -- can you repeat that?
21    Q.    The compliance guide to which you
22 referred, is this something which is published
23 annually or does it have just periodic
24 revisions?

Page 15

1    A.    Periodic revisions. It is
2 different articles and it is a publication that
3 comes out. I think it's every couple of months.
4    It keeps me current.
5    Q.    Do you receive any information from
6 the Pike Institute by any chance?
7    A.    No.
8    Q.    Is The Guide for learning
9 disabilities specifically or is it generally for
10 disabilities?
11    A.    Disabilities.
12    Q.    When you use the term learning
13 disabilities, are you referring strictly to
14 mental or cognitive disabilities or are you also
15 referring to physical disabilities?
16    A.    Mental and cognitive.
17    Q.    Your work though I take it extends
18 to physical disabilities as well?
19    A.    Yes, it does.
20    Q.    And anything which would be
21 classified as a disability would generally come
22 under your review?
23    A.    Yes.
24    Q.    Do you maintain any lists of

Page 16

1 recognized disabilities as part of your work or
2 do you instead refer to these guidelines?
3    A.    I'm not sure what you are asking.
4    Q.    Well, for example, as part of your
5 work do you recognize that carpal tunnel
6 syndrome is a disability?
7    A.    I don't look at the diagnosis per
8 se. I look at what the functional limitation
9 are within the setting. So, I'm looking to see
10 how the so-called disabilities impacts a person
11 in an environmental setting -- in an educational
12 setting. Having a diagnosis does not
13 automatically make you eligible for services.
14    Q.    In other words, any kind of a
15 physical or mental limitation must also
16 interfere with education in some way before it
17 becomes part of your jurisdiction so to speak?
18    A.    Exactly.
19    Q.    Would you consider any physical or
20 mental limitation as potentially giving rise to
21 an educational limitation of the sort that you
22 indicated?
23    A.    I can't answer that.
24    Q.    How do you determine if someone in

Page 17

1 fact has such a mental or physical limitation?
2    A.    I review their documentation and
3 read carefully how this diagnosis or disability
4 impacts them and in what ways this student will
5 be at a disadvantage if not provided the proper
6 accommodations.
7    Q.    And if you perceive that the
8 documentation establishes that the student would
9 be at a disadvantage, then you would intervene
10 in some way?
11    A.    Yes.
12    Q.    You had talked earlier about
13 intervening in terms of the classroom setting.
14 Do you also intervene as to testing or
15 examinations?
16    A.    Yes.
17    Q.    Do you also seek accommodations
18 when that is appropriate in the testing and
19 examination?
20    A.    Yes.
21    MR. HERNANDEZ:  Could you mark
22 this, please.
23
24

5 (Pages 14 to 17)

BONNIE ALPERT
9/19/2002

Page 18

```
 1          (Exhibit 1, Five-Page Document,
 2          Student Disability Services,
 3          marked)
 4
 5   BY MR. HERNANDEZ:
 6      Q.   I am showing you what has been
 7   marked as Exhibit 1, which is a set of documents
 8   that I received in discovery I represent. It is
 9   five pages, but one is blank.
10          Do you recognize these documents?
11      A.   Yes.
12          MS. SMITH: It looks like a
13   four-page -- one, two, three, four. Yes, This
14   is a four-page document.
15          MR. HERNANDEZ: Okay.
16          MS. SMITH: Okay. Just so --
17          MR. HERNANDEZ: Off the record.
18
19          (Off record discussion)
20
21   BY MR. HERNANDEZ:
22      Q.   The first two pages appears to be
23   something under the rubric of SDS Student
24   Disability Services.
```

Page 19

```
 1      A.   Yes.
 2      Q.   Could you tell me what that is?
 3      A.   This is our brochure for
 4   disabilities services.
 5      Q.   And to whom do you distribute it?
 6      A.   This goes out with the admissions
 7   people when they're doing their travels trying
 8   to, you know, let people know about Western New
 9   England. I also have them available at the
10   orientation and at the open houses.
11          Different departments on campus
12   request them.
13      Q.   Is this automatically distributed
14   to all students or is it just made available to
15   students?
16      A.   It is made available to students.
17      Q.   Through the means that you have
18   just described?
19      A.   Exactly.
20      Q.   And when say, it is distributed to
21   admissions people, does that include law school
22   admissions people?
23      A.   I don't know.
24      Q.   Did you write this?
```

Page 20

```
 1      A.   Yes.
 2      Q.   You outlined that in here some
 3   processes the students would use for obtaining
 4   these services?
 5      A.   Yes.
 6      Q.   You indicate under What Happens
 7   Next, extended time for exams and papers?
 8      A.   Where are you?
 9      Q.   What Happens Next is on the second
10   page.
11      A.   Oh, okay.
12      Q.   You put, extended time for exams
13   and papers, peer note takers in the class, exams
14   given in a distraction-free setting, audio
15   taping of class lectures, alternative testing
16   formats. Are these typical forms of
17   accommodation that you help students obtain?
18      A.   If it is consistent with their
19   documentation.
20      Q.   Could you explain what you mean by
21   that?
22      A.   If the documentation -- as I
23   mentioned at the very beginning, one of the
24   things that the documentation should include is
```

Page 21

```
 1   some kind of description of the functional
 2   limitation and recommendations from a qualified
 3   person. Usually a psychiatrist, psychologist,
 4   medical doctor.
 5      Q.   And that is what you studied to
 6   determine which of these might be appropriate,
 7   if any?
 8          MS. SMITH: Objection. You can
 9   answer.
10          THE WITNESS: Yes. And I also like
11   to speak with the students to get further
12   information that might not necessarily be
13   available in the documentation.
14   BY MR. HERNANDEZ:
15      Q.   Okay.
16      A.   But I will always request that if
17   it is not in there that they try and get it in
18   there.
19      Q.   Could I ask you in the six years
20   that you have been in this position, how many
21   students have you helped?
22      A.   Well, I can tell you right now I
23   have about approximately 100 students that are
24   registered with our service. It has been fewer
```

6 (Pages 18 to 21)

BONNIE ALPERT
9/19/2002

Page 82

1  long it had been.
2  BY MR. HERNANDEZ:
3      Q.    Were you aware of the results of
4  her petition in December of 2000?
5      A.    Only that she was readmitted and
6  asked to repeat her first year classes and that
7  they were willing to provide her with
8  accommodations.
9      Q.    How did you learn that?
10     A.    Through Dianne.
11     Q.    Did she call you with that
12 information or did she --
13     A.    I can't recall that.
14     Q.    Do you recall on August 29th when
15 she came in to see you that she was calling your
16 attention to the fact that although she had been
17 promised a note taker, she had not yet been
18 assigned one?
19     A.    Yes, because she said she needs a
20 note taker in her classes.
21     Q.    And did you do anything else with
22 that information?
23     A.    I don't recall.
24     Q.    What is the next contact you can

Page 83

1  recall with Dianne?
2      A.    On the 2nd of October.
3      Q.    There is a note on the last page of
4  5-B on that as well?
5      A.    Yes.
6      Q.    And it says, breaching
7  confidentiality at law school?
8      A.    Yes.
9      Q.    What was that about?  What was that
10 meeting about?
11     A.    I don't recall the details of that.
12 Only that Dianne came in upset because she felt
13 that confidentiality was breached.
14     Q.    Do you recall anything about how
15 she felt it had been breached?
16     A.    I don't recall.
17     Q.    Did she discuss with you anything
18 that had gone on with Professor Gordon?
19     A.    I don't recall.
20     Q.    When she would come to see you --
21 I'm going back to August 29th again -- did you
22 tell her that you would work on the issue of her
23 getting a note taker?
24     A.    I can't imagine that I wouldn't

Page 84

1  have said that, but I don't recall saying it.
2      Q.    You said you couldn't imagine that
3  you would not have said that?
4      A.    Yes.  Because if she wasn't getting
5  a note taker, then I would have wanted to find
6  out about that.
7      Q.    And do you recall finding out about
8  it?
9      A.    No.
10     Q.    Do you recall making any calls to
11 the law school about it?
12     A.    No.
13     Q.    Any conversations with Mary Houten
14 or Nancy Sykes?
15     A.    I don't recall.
16     Q.    You have testified a little bit
17 about the October 30th meeting that you had
18 concerning the inadequacy of the notes and a
19 conversation you had with Nancy Sykes on the
20 same day.  Did you have any other contact with
21 Dianne between October 2nd and October 30th?
22     A.    Not that I recall.
23     Q.    Do you recall any conversations
24 concerning voice-activated software?

Page 85

1      A.    Yes.  In our initial meeting we
2  talked about voice-activated software and how it
3  might be a nice alternative for Dianne, you
4  know, since her hand was bothering her.
5      Q.    Is that the only conversation you
6  had with her about that?
7      A.    No.  There were other conversations
8  in which Dianne told me how great it was and
9  that she was using it to do her briefs.
10     Q.    Was there any conversation about
11 using it in the classroom or for exams?
12     A.    Only during our initial
13 conversation.
14     Q.    Did you notify any source that she
15 was not being permitted to use it for exams?
16     A.    After she failed the second time,
17 she came back and said I was never allowed to
18 use the voice-activated software for the tests.
19            However, I didn't know about this
20 prior to.
21     Q.    When you talked to her on
22 October 30th, did you tell her that she had to
23 deal with Nancy Sykes directly?
24     A.    I don't recall.  However, it is my

22 (Pages 82 to 85)

BONNIE ALPERT
9/19/2002

Page 90

1  Dianne the fact that she was being given only
2  15 minutes for her exams; an additional
3  15 minutes per exam?
4      A.   15 minutes per hour.
5      Q.   Per hour.
6      A.   I don't recall that. I do know
7  that she was -- based on the recommendation of
8  the doctor, she was -- it was recommended that
9  she get 20 minutes. What was it -- a writing
10 break every 20 minutes, you know, 15 minutes per
11 hour could be equivalent to 20 minutes. A
12 writing break every 20 minutes.
13     Q.   When you say could be, is that
14 something you discussed with someone?
15     A.   No. But there is no indication
16 here as to how much -- how much time the break
17 should be.
18     Q.   Did Dianne raise with you the issue
19 about sufficiency of 15 minutes?
20     A.   No, not prior to.
21     Q.   Not prior to?
22     A.   Not prior to taking the tests.
23     Q.   To your knowledge, were students
24 given more than 15 minutes per hour on exams on

Page 91

1  occasion?
2      A.   I don't know.
3      Q.   When you discussed voice-activated
4  software with Dianne, why were you discussing
5  that as a possible accommodation?
6      A.   We had just purchased some and were
7  finding it very helpful to some students. And
8  I felt that it might be useful for Dianne as
9  well.
10          It was a recommendation on my part.
11     Q.   And were you aware that that had
12 been turned down?
13     A.   Not until after the testing.
14     Q.   Do you know why it was turned down?
15     A.   No.
16     Q.   Do you recall Dianne giving you
17 authorization to talk to Wayne Carpenter about
18 voice-activated software?
19     A.   Wayne Carpenter is the school
20 counselor. I don't recall that. But I don't
21 know why I would talk to Wayne Carpenter about
22 that.
23     Q.   You don't recall Dianne giving you
24 authorization to talk to him?

Page 92

1      A.   No. That does not mean that she
2  didn't.
3      Q.   Based on your education and
4  experience, are you aware that carpal tunnel
5  syndrome can interfere with a student's ability
6  to write longhand and take notes?
7      A.   I'm not in a position of judging to
8  what extent it interferes.
9      Q.   But my question is, you are aware
10 that it can interfere?
11     A.   Yes.
12     Q.   And it can give rise to a need for
13 accommodation?
14     A.   Yes.
15     Q.   In terms of major depression, are
16 you aware that it can interfere with a student's
17 ability to concentrate?
18     A.   Yes.
19     Q.   And it can give rise to a need for
20 distraction-free testing, for example?
21     A.   Yes.
22     Q.   Do you know of other students who
23 have been accommodated relative to carpal tunnel
24 syndrome?

Page 93

1      A.   That I have worked with?
2      Q.   Yes.
3      A.   No.
4      Q.   Do you know other students who
5  have --
6      A.   Oh, I retract that. Yes, I had a
7  student who had carpal tunnel and -- but that's
8  all we did was provide her a scribe on her
9  exams.
10     Q.   Did you follow up on that to
11 determine if it had worked?
12     A.   She came to my office to take her
13 tests, so I knew what was going on.
14     Q.   Did it appear to be successful as
15 an accommodation?
16     A.   Yes and no. It was frustrating to
17 have somebody else write. However, she was --
18 it was majorly stress at the time. However, it
19 did relieve itself eventually.
20     Q.   What about major depression. Have
21 you ever sought accommodations for students with
22 major depression?
23     A.   Yes.
24     Q.   What kinds of accommodations have

24 (Pages 90 to 93)

**EXHIBIT 2**

MARY VAN HOUTEN
9/20/2002

Page 1

1          FOR THE COMMONWEALTH OF MASSACHUSETTS

2    Hampden: ss              District Court Division

3                             C.A. No. 01-12-199-FHF

4    *********************************

5    DIANNE MARLON                      *

6          Plaintiff,                   *

7             vs.                       *

8    WESTERN NEW ENGLAND COLLEGE        *

9          Defendant,                   *

10   *********************************

11

12          DEPOSITION OF: MARY VAN HOUTEN

13             CATUOGNO COURT REPORTING

14                1414 Main Street

15             Springfield, MA  01144-1011

16      September 20, 2002        10:10 a.m.

17

18

19

20

21             Rita I. Steinke

22           Shorthand Reporter

23

24

MARY VAN HOUTEN
9/20/2002

Page 6

1    A.    1991.
2    Q.    Have you been employed by the
3  college since your graduation basically?
4    A.    Yes.  Well, I was hired before.  I
5  finished there.
6    Q.    When did you obtain your
7  undergraduate degree?
8    A.    Nazareth College in Kalamazoo,
9  Michigan.
10    Q.    When was that?
11    A.    '75, 1975.
12    Q.    What was your major?
13    A.    French.
14    Q.    Would you describe your
15  responsibilities as Director of Student Records.
16    A.    Well, in a nutshell, I run a
17  Registrar's Office, and so I am responsible for
18  registration and registration materials and
19  responsible for grades, recording grades and
20  transcripts, keeping student files.
21         And unlike some Registrar's
22  Offices, I am also responsible for examinations.
23  I create the exam schedule and I -- so I
24  schedule exams for all of the courses and I

Page 7

1  schedule exams for students with regular exam
2  conflicts; two exams in the same day, things
3  like that.
4         And I am also responsible for
5  scheduling and providing students with -- who
6  need exam accommodations.
7    Q.    To whom do you report?
8    A.    I report to the Associate Dean.
9    Q.    Who is that?
10    A.    Arthur Leavens.
11    Q.    You said that one of your
12  responsibilities is to provide for
13  accommodations in student examinations?
14    A.    Yes.
15    Q.    Do you have any other role with
16  respect to providing accommodations for
17  students?
18    A.    No.
19    Q.    At any time have you had another
20  role with respect to providing accommodations?
21    A.    Well, I had -- there was a small
22  period where we didn't have anybody to -- who
23  was -- had that role of determining what the
24  accommodations should be.  So I stepped in for I

Page 8

1  think it was less than two years and I did that.
2    Q.    With respect to providing
3  accommodations for exams, how do you go about
4  determining that a student needs an
5  accommodation?
6    A.    Are you talking about when I was
7  doing that?  Because right now I'm just the
8  provider.
9    Q.    That's what I wanted to clarify.
10         Right now how do you determine that
11  somebody needs an accommodation?
12    A.    I'm told by the Assistant Dean for
13  Law Student Affairs.
14    Q.    And is that Nancy Sykes?
15    A.    Um-humh.
16    Q.    Is that a yes?
17    A.    I'm sorry.  Yes.
18    Q.    During the period in which you
19  actually determined more broadly the needs for
20  accommodations, how did you go about determining
21  that a student needed accommodations?
22    A.    If a student came to me I would --
23  I would need to see some kind of documentation,
24  medical documentation.

Page 9

1         Usually, for example, physical
2  disability, there would be some kind of report
3  or letter from a medical doctor describing that
4  condition and what kind of accommodations might
5  be needed or were -- or were recommended.
6         In the case of a learning
7  disability, the documentation usually consisted
8  of tests, and then an analysis of test results
9  with a diagnosis and recommendations for both
10  the student and for the patient to do -- take on
11  themselves to help cope with the disability, and
12  maybe accommodations they might need in terms of
13  classroom or testing conditions.
14         And then I will follow those;
15  whatever it said in the documentation.
16    Q.    Did you have any special training
17  in disability accommodations or anything of that
18  sort?
19    A.    No.
20    Q.    Were there any written standards
21  for determining that a student was entitled to
22  accommodations?
23    A.    No, there are no written standards.
24    Q.    Did you ever work with the office

3 (Pages 6 to 9)

CATUOGNO COURT REPORTING SERVICES
Worcester, MA    Boston, MA

Springfield, MA                                                Providence, RI

Page 22

1    A.   Not while I was making the
2  decisions.
3    Q.   Could you just look at the last
4  page, please.
5    A.   Yes.
6    Q.   Do you see the end of that last
7  paragraph?
8    A.   Yes.
9    Q.   There is a reference to students
10 who dictated their examination answers to a tape
11 recorder?
12   A.   Yes, that was before I was there.
13   Q.   That was before you?
14   A.   Yes.
15   Q.   Do you have any personal knowledge
16 about those cases?
17   A.   Yes.
18   Q.   Do you recall what the problems
19 were with those students?
20   A.   Well, the first student who tape
21 recorded his answers was a student who had had a
22 hand injury, the nature of which I am unfamiliar
23 with.
24        And again, this was a decision made

Page 24

1  transcribe those.
2    Q.   During the time that you were in
3  charge, did anybody ever request use of
4  voice-activated computers?
5    A.   Of me?
6    Q.   Yes.
7    A.   No.
8    Q.   Are you aware of any requests at
9  any time for use of a voice-activated computer
10 program for testing?
11   A.   Yes.
12   Q.   How many times has that come up?
13   A.   Twice.
14   Q.   To whom were the requests made?
15   A.   Gee, I think they were made to
16 Assistant Dean for Law Shool Affairs, Nancy
17 Sykes.
18   Q.   Were they approved on either
19 occasion?
20   A.   On one occasion.
21   Q.   When was that?
22   A.   It was last year.
23   Q.   The time in which it was not
24 approved, is that the request by Dianne Marlon?

Page 23

1   by the Associate Dean Molly Geraghty.
2        And he could write, but his
3  handwriting as a result of his hand injury
4  apparently -- this is what I was told -- was
5  illegible. So, he would dictate his answers.
6        And I'm trying -- this was a long
7  time ago so I'm trying to remember. I think --
8  I think he would dictate his answers. The
9  answers would be transcribed.
10       And I think that was it. I don't
11 think he received any -- anything else, any
12 other accommodation.
13       The other was a student who had
14 suffered a stroke before coming to law shool and
15 he did suffer from obvious -- obviously suffered
16 from paralysis on one side.
17       And, you know, I don't know. I
18 mean, I know what he told me, but I'm assuming
19 that the Associate Dean who made the decision
20 had whatever had -- you know, had something in
21 writing about his disability.
22       But he had a stroke and he would
23 dictate his answer into an answering machine --
24 I mean, tape recorder and the secretaries would

Page 25

1    A.   Yes.
2    Q.   How were you aware that she had
3  requested voice-activated software?
4    A.   Dianne told me.
5    Q.   When did she tell you?
6    A.   I don't remember exactly.
7    Q.   Do you know whether it was before
8  or after the exam?
9        MS. SMITH:  Objection.
10       THE WITNESS:  Does an objection
11 mean --
12       MS. SMITH:  You can answer.
13       THE WITNESS:  Okay.
14       Before -- I don't know whether she
15 was asked -- well, I don't know when -- I don't
16 really -- I really have no idea when Dianne told
17 me.
18 BY MR. HERNANDEZ:
19   Q.   Okay.
20       I'm going to ask you to help with
21 some other documents that we were provided with.
22       This is Exhibit 12. I'm wondering
23 if you know what this is.
24   A.   This a report from a database that

7 (Pages 22 to 25)

MARY VAN HOUTEN
9/20/2002

Page 34

1    count.
2        Maybe about 26.
3        MR. HERNANDEZ:  Mark this, please.
4
5        (Exhibit 23, Spring 2001 Exam
6        Schedule Planning Report, marked)
7
8    BY MR. HERNANDEZ:
9    Q.    Finally in this series, Exhibit 23.
10   Could you please look at that document and
11   identify it for the record.
12   A.    That is the same type of exam
13   planning document from the spring of 2001.
14   Q.    Could you tell me the number of
15   entries which represent accommodations?
16   A.    About 39.
17   Q.    As to all of these documents which
18   are basically tables of reports, you referred to
19   them as your planning document?
20   A.    Yes.
21   Q.    On the original, are the names of
22   the students included?
23   A.    Yes.
24   Q.    So these have been redacted?

Page 35

1    A.    Just took the names off.
2    Q.    Let me show you what has been
3    marked as Exhibit 15. Is this a document you
4    prepared?
5    A.    I prepared it just for this case.
6    Q.    Can you tell me from where you
7    derived the information?
8    A.    I went back through -- I keep a
9    file for each semester of exams and I went back
10   through and actually looked -- tried to look at
11   these planning reports that you just had me go
12   through and pulled the names off.  And then I
13   went to the student files and got the rest of
14   the information from the student files.
15   Q.    Do the student files contain
16   information about the disability?
17   A.    Yes.
18   Q.    Is there one set of student files
19   or do you maintain separate files for purposes
20   of test scheduling?
21   A.    Well, I maintain a file for exams
22   for each semester of exams.
23   Q.    Not each student's?
24   A.    We have a student file.

Page 36

1    Q.    When you say a student file, each
2    student has a file at the school?
3    A.    Yes.
4    Q.    And information about the
5    disability would normally be there?
6    A.    Yes.
7    Q.    Would information about their
8    accommodations also with be there or would that
9    just be in your scheduling files?
10   A.    Information about the
11   accommodations should be in there.  I couldn't
12   say for sure that information about the
13   accommodations provided were in each of the
14   student's files.
15   Q.    You made a distinction between
16   extra time and rest time.  Would you just
17   explain that distinction?
18   A.    Well, extra time on an exam and
19   extra time above the time normally permitted by
20   the instructor to take the test.
21        And rest time would be time that is
22   given somebody to rest, but they are not
23   answering the exam.  It is not part of their
24   test time.

Page 37

1    Q.    When you give rest time, is there
2    any monitoring to determine that the time is
3    used for rest or is there someone to determine
4    the time is being used for rest as opposed to
5    extra exam time?
6    A.    We don't monitor it, no.
7    Q.    Are the students directed to use it
8    for rest time as opposed --
9    A.    Yes.
10   Q.    So when a student is told he is
11   being given 15 minutes per hour rest time,
12   they're supposed to use that not on the exam but
13   merely to rest their hand or whatever?
14   A.    Yes.
15   Q.    As compared to that, students that
16   were given extra time can use all of the time
17   allotted to work on the exam?
18   A.    Yes.
19        MR. HERNANDEZ:  Mark this, please.
20
21        (Exhibit 24, Letter, marked)
22
23   BY MR. HERNANDEZ:
24   Q.    Would you look at what has been

10 (Pages 34 to 37)

CATUOGNO COURT REPORTING SERVICES
Worcester, MA    Boston, MA

**EXHIBIT 3**

Page 1

```
 1        FOR THE COMMONWEALTH OF MASSACHUSETTS

 2   Hampden: ss              District Court Division

 3                            C.A. No. 01-12-199-FHF

 4   *********************************

 5   DIANNE MARLON                        *

 6        Plaintiff,                      *

 7            vs.                         *

 8   WESTERN NEW ENGLAND COLLEGE          *

 9        Defendant,                      *

10   *********************************

11

12            DEPOSITION OF:  NANCY SYKES

13            CATUOGNO COURT REPORTING

14               1414 Main Street

15            Springfield, MA  01144-1011

16        September 19, 2002      2:05 p.m.

17

18

19

20

21

22             Rita I. Steinke

23            Shorthand Reporter

24
```

NANCY SYKES
9/19/2002

Page 10

1    I am somewhat the -- part of my
2  title at one time was also special projects;
3  Assistant Dean for Law School Affairs and
4  Special Projects. So, oftentimes I work with
5  publicity, people, our communications department
6  and do -- as far as people coming into the
7  school and doing presentations in the school.
8        And I am the person that our
9  students see if they need special accommodations
10  in the classroom or for exam purposes.
11   Q.    To whom do you report?
12   A.    Currently I report to Dean Arthur
13  Leavens and also to Dean Art Gaudio.
14   Q.    How is that divided?
15   A.    I picture it this way. There is a
16  direct line to Dean Leavens and there is a
17  dotted line to Dean Gaudio.
18   Q.    Do you oversee any personnel?
19   A.    Art Leavens and I share a
20  secretary, administrative assistant Barbara
21  Cooley.
22   Q.    How many students are there at
23  Western New England Law School at this time?
24   A.    I'm not going to be able to give

Page 11

1  you the exact number. I really don't know the
2  exact number. But less than 600. Between 400
3  and 600.
4        It is a big gap there, isn't it?
5   Q.    Has that been the range over the
6  last four or five years?
7   A.    I can only really speak pretty much
8  for the last three years, but yes.
9   Q.    With reference to your duties
10  relative to students needing accommodations in
11  the classroom or for examinations, could you
12  explain those duties?
13   A.    Students will come to me explaining
14  to me why they're there, that they're there to
15  talk about special needs or special
16  accommodations that they may have or that they
17  may have received in the past.
18        And then we talk about what
19  documentation they would need or what
20  documentation -- many times they have already
21  provided the documentation.
22        And then we discuss what
23  accommodations are possible.
24   Q.    Have you had any special training

Page 12

1  or education in special needs or disabilities?
2   A.    I think I'm going to ask you if you
3  would just clarify that a little. Do you --
4  just what do you mean by special training?
5   Q.    Well, have you received any
6  training in administering programs for special
7  needs?
8   A.    I have not received any training in
9  administering special programs for special
10  needs.
11   Q.    Have you received any training
12  related to it?
13   A.    I worked at the Disability Examiner
14  in the State of Michigan.
15   Q.    When was that?
16   A.    This was back in 1968-69.
17   Q.    Have you had any training or
18  education in disability law?
19   A.    No. Other than the fact that I
20  have in the past taught Gender in the Law, which
21  certainly had some aspects of discrimination to
22  it.
23   Q.    Do you have any written policies or
24  procedures which govern your administration of

Page 13

1  services to disabled or handicapped students?
2   A.    You mean at the law school?
3   Q.    Yes.
4   A.    No.
5   Q.    Do you rely on any written
6  standards?
7   A.    No.
8   Q.    How do you make a determination
9  that a student should get an accommodation?
10   A.    Generally it is really two ways.
11  First and foremost, I rely on the documentation
12  that I am provided.
13        And second of all, I sometimes in
14  connection with the documentation rely on
15  conversations with the student.
16   Q.    Does the law school distribute any
17  information to the students about the
18  availability of accommodations or services for
19  the disabled?
20   A.    I know that admissions -- the
21  Admissions Department sends -- makes some
22  mention in their letters to admitted students
23  that if they have any special needs, they are to
24  contact me. I know that is in a letter that

CATUOGNO COURT REPORTING SERVICES
Springfield, MA              Worcester, MA      Boston, MA                    Providence, RI

NANCY SYKES
9/19/2002

Page 14

1  goes out to admitted students.
2        I know that currently in the
3  Student Handbook there is section that says if a
4  student has any special needs for
5  accommodations, they are to see Dean Sykes.
6        And I know that during orientation
7  I speak to every incoming class as far as
8  announcing that please to see me if they have
9  any interest in discussing special needs.
10     Q.   You assumed your position in
11  November of 1999?
12     A.   That's correct.
13     Q.   Have you had that responsibility
14  for providing accommodations since 1999?
15     A.   I need to elaborate on that a
16  little bit.
17     Q.   Sure.
18     A.   When I came in in November of 1999,
19  my position as the Assistant Dean for Student
20  Affairs had been empty for a little bit over a
21  year I believe.
22        And during that time period, the
23  students in the law school were given
24  information in the Student Handbook to go to see

Page 15

1  Mary Van Houten as far as any of their special
2  needs or accommodations were concerned.
3        So when I came in in November of
4  '99, the handbook was not changed to say to come
5  to see me until the fall, the following fall,
6  which would be the fall of 2000.
7     Q.   During that interim period from
8  November 1999 to the fall of 2000, did you
9  actually participate in providing accommodations
10  to law students?
11     A.   I need to ask you to elaborate a
12  little bit. I just want to make sure.
13     Q.   Sure. Any time.
14     A.   Okay.
15     Q.   During that period before the fall
16  of 2000, were you formerly in the handbook given
17  that responsibility?
18     A.   Yes.
19     Q.   Did you actively participate in the
20  process of finding accommodations for students?
21     A.   I think with the word you have
22  actually changed it to actively participate. I
23  know that I discussed this with Mary.
24     Q.   Okay. Would she consult with you

Page 16

1  on these issues?
2     A.   We would talk about them, yes.
3        But I am hesitate -- I am hesitant
4  to say that I actively participated in each
5  decision.
6     Q.   Just so that I understand. When
7  you say you talked about them, would she bring
8  to you particular cases or circumstances to
9  discuss?
10     A.   It would have been when I came in
11  in November. The exam period at that point with
12  then the next exam period would be December.
13     Q.   Okay.
14     A.   And I think at that stage I
15  certainly knew which students were receiving
16  accommodations, but I was not actively involved
17  in making the decision.
18     Q.   So during that period, the decision
19  actually continued to --
20     A.   To stay with Mary.
21     Q.   Okay.
22     A.   Remembering I'm sure from your own
23  law school days, by the time I came into the
24  job, into my actual position, it was very close

Page 17

1  to the exam period, and most of those decisions
2  would have already been made.
3     Q.   But as of the fall of 2000, those
4  decisions were yours?
5     A.   Yes.
6     Q.   You say you would review records or
7  documents provided by students as part of the
8  decision making process for accommodation.
9        Is it fair to say that the process
10  had to be initiated by the student?
11     A.   Yes.
12     Q.   And when the student came to you
13  and discussed the possibility of an
14  accommodation, you would explain to the student
15  what documentation you were looking for?
16     A.   You are now speaking in the past
17  tense.
18     Q.   I'm now speaking from the time in
19  the fall of 2000 to the present. And if there
20  have been changes, you can tell me; you can
21  explain it to me.
22     A.   Yes. Except most of the time in
23  the early cases, the documentation was already
24  present.

5 (Pages 14 to 17)

NANCY SYKES
9/19/2002

Page 30

1  BY MR. HERNANDEZ:
2      Q.    So he would e-mail them and you
3  would print them out?
4      A.    He would e-mail me them the next
5  morning and I would print them out, yes.
6      Q.    Did you ever review the notes?
7      A.    I don't think so.
8      Q.    What was your next contact with
9  Dianne?
10     A.    My next contact with Dianne.
11         I know that my secretary contacted
12 her about how to pick up the notes.  And we made
13 an arrangement.  I'm just thinking out loud.
14     Q.    Yes.
15     A.    I don't remember if I had any more
16 informal contacts with her, but I do know that
17 we met again on November 3rd.  But I can't say
18 if we had any informal contact.  We often did,
19 so I just can't say.
20     Q.    Well --
21     A.    Go ahead.
22     Q.    Do you recall the day that you
23 first met with her about this?  So it was at the
24 end of August?

Page 31

1      A.    Yes, the end of August.
2      Q.    Can you tell me anything more
3  specifically?
4      A.    No.
5      Q.    Between that date in any event and
6  November 3rd, you say there may have been some
7  informal contact?
8      A.    Yes.
9      Q.    You don't recall any specifics?
10     A.    Yes, that's correct.
11     Q.    Do you recall the substance of
12 anything you discussed informally during that
13 period?
14     A.    When I would say informal, I
15 imagine it would have been something about how
16 are you doing Dianne or --
17     Q.    I see.
18     A.    I know there was a time that we
19 talked about the newspaper.  Dianne was involved
20 with the school newspaper.  I know there were
21 times we talked about that.  Whether that was
22 before November 3rd, I'm not -- I cannot recall
23 that.
24     Q.    What was the newspaper issue?

Page 32

1      A.    Dianne was -- had taken on a major
2  responsibility and that is she was trying to
3  find out the tax exempt number for the school
4  newspaper and trying to work out the accounts as
5  far as the newspaper was concerned.
6          And I was helping her with that.
7  We were trying to work it out together.  But I
8  just can't say if that is exactly when that
9  happened.
10     Q.    At any event, you do have a memory
11 of meeting with her or being in contact with her
12 on November 3rd?
13     A.    Yes.
14     Q.    Was that contact by phone or in
15 person?
16     A.    In person.
17     Q.    What happened then?
18     A.    Well, I knew that Dianne was coming
19 to the meeting to talk about the note taking --
20 the note taker of the notes.  And I believe I
21 knew that because of a phone conversation with
22 her or -- I'm not certain of that.
23         But I knew that that was one of
24 her -- the issue she wanted to discuss.  And so

Page 33

1  we did discuss it.
2      Q.    Could you describe your discussion?
3      A.    Well, yes.  Everything I say is on
4  the record, right?
5      Q.    Of course.
6      A.    All right.  Sometimes I have to
7  close my eyes in order to remember, so that's
8  why I'm closing my eyes.
9      Q.    That will not be noted on the
10 record unless you mention it.
11     A.    I recall that Dianne -- we started
12 off -- I remember asking Dianne how she -- well,
13 I remember part of the conversation was how are
14 you doing?  How are things going this year,
15 Dianne.
16         And she seemed very positive about
17 it.  She -- I do remember her saying that she
18 really wanted to do well this year and that she
19 was hoping to make law review and that she felt
20 good about the classes that she was having to
21 repeat.  That the material was familiar to her
22 and that she felt good about knowing the
23 material.
24         And I remember we talked --

9 (Pages 30 to 33)

NANCY SYKES
9/19/2002

Page 62

1      Q.     And again, you don't recall getting
2   it from them directly?
3      A.     Well, I'm sure it must not -- no.
4   It's addressed to Dean Leavens so I doubt that I
5   received it directly.
6      Q.     Did you receive this from Dean
7   Leavens?
8      A.     Handed to me? No.
9      Q.     Do you know how you came to get it?
10     A.     I didn't get it. It's in her file.
11     Q.     Have you seen it before today?
12     A.     Yes.
13     Q.     Do you know how it happened to get
14   into her file?
15     A.     I assume Dean Leavens put it in
16   there.
17     Q.     This file then that we are
18   referring to as Dianne's file, is this a file
19   that is maintained by Dean Leavens?
20     A.     No, it is a file that -- each
21   student has a permanent file at the law school.
22     Q.     I see. When you say you have seen
23   it before, you have seen it from her permanent
24   file?

Page 63

1      A.     That is going to be a hard one for
2   me to answer. Did I see it from her permanent
3   file or did I see it when I looked at the her
4   file to repetition.
5          That's a hard one for me to answer.
6   I can't answer that.
7      Q.     Did you maintain a file?
8      A.     No, I did not.
9      Q.     And the last item, is that the same
10   answer? Is it something that --
11     A.     Wait. This?
12     Q.     Yes, the last --
13     A.     Right. I -- I don't know what that
14   is.
15     Q.     Thank you.
16     A.     Is that yours or mine?
17     Q.     I will take that one.
18     A.     Sorry.
19     Q.     Thank you.
20         MR. HERNANDEZ: Mark this, please.
21
22         (Exhibit 14, 11/3/00 Memo to File
23         from Nancy Sykes, marked)
24

Page 64

1   BY MR. HERNANDEZ:
2      Q.     Let me show you what has been
3   marked as Exhibit 14.
4          MS. SMITH: How was this marked?
5   As Exhibit 13?
6          MR. HERNANDEZ: Yes.
7          MS. SMITH: Thank you.
8   BY MR. HERNANDEZ:
9      Q.     Do you recognize this document?
10     A.     Yes, I do.
11     Q.     What is this?
12     A.     This is a note I made for Dianne's
13   file after our meeting on November 3rd.
14     Q.     When you say for her file, is this
15   the permanent file?
16     A.     Yes, sir.
17     Q.     Going down these items. Are these
18   notes that you took sometime relatively shortly
19   after the meeting?
20     A.     Yes.
21     Q.     The third item is, she will request
22   more time on exams. Do you recall that
23   discussion?
24     A.     At the November 3rd meeting?

Page 65

1      Q.     Yes. That was the discussion that
2   led to the 15 minutes for each hour of the exam
3   rest period?
4          How was the 15 minutes reached as a
5   time for the exam?
6      A.     The 15 minutes for each hour of
7   rest?
8      Q.     Yes.
9      A.     That was what her doctor had
10   recommended.
11     Q.     When you say her doctor had
12   recommended, going back to the --
13     A.     No.
14     Q.     What had you seen from her doctor
15   that recommended that?
16     A.     I had seen a written statement on
17   like a prescription pad.
18     Q.     Do you know how you came to see
19   that?
20     A.     That was -- I believe either sent
21   directly to me by Bonni Alpert or it was sent by
22   Dianne Marlon to be put in her file. I can't --
23   I just can't recall.
24         Or maybe I just don't know the

17 (Pages 62 to 65)

NANCY SYKES
9/19/2002

Page 66

1  answer as to whether she sent it directly to
2  Bonni and Bonni sent it here or whether she did
3  both. I don't know that.
4      Q.    Let me show you what has previously
5  been marked as Exhibit 5A. And ask you
6  whether --
7      A.    Yes, I've got one.
8      Q.    This is the document that you are
9  referring to?
10     A.    Yes.
11     Q.    It mentions here, breaks every 20
12 minutes?
13     A.    Yes.
14     Q.    It doesn't indicate how long those
15 breaks are supposed to be. Can you explain to
16 me how it got from that item on the third
17 page --
18     A.    Where it says writing breaks every
19 20 minutes?
20     Q.    Right.
21     A.    Yes.
22     Q.    How did you interpolate that into
23 15 minutes of rest for each hour?
24     A.    Well, I think that I was thinking

Page 67

1  that you have how many 20 minutes in an hour.
2  And that you can take a break after each
3  20 minutes. So you can use your 15 minutes of
4  rest any way you want.
5      Q.    How did you come up with 15 minutes
6  for each hour?
7      A.    There is one 20 minutes and you
8  take a five-minute break.
9      Q.    Excuse me. How did you get to five
10 minutes?
11     A.    Actually, it was however Dianne
12 wanted to use that break time.
13     Q.    No. My question is, you said that
14 you concluded that she would have three
15 five-minute breaks and she could use them any
16 way she wants.
17         How did you determine that five
18 minutes was the appropriate amount of time for a
19 break?
20     A.    I didn't determine that. I
21 determined that she could have 15 minutes of
22 rest for each hour of an exam.
23     Q.    How did you --
24     A.    And she could use all 15 minutes at

Page 68

1  once if she wished.
2      Q.    How did you come to the figure of
3  15 minutes?
4      A.    It seemed like a logical
5  representation of what her doctor was
6  recommending. And I think also that this was
7  not an unusual standard as far as other
8  accommodations.
9      Q.    So if --
10     A.    For other students. In other
11 words, it was not an unusual accommodation.
12     Q.    So, other students have also
13 requested accommodations of this type and the
14 15-minute standard had been applied uniformly?
15     A.    Yes.
16         Oh, I don't know. I didn't say
17 uniformly. I said that I didn't think it was an
18 unusual standard to use.
19     Q.    I'm sorry. When you say other
20 students, these are other students that you had
21 approved or were these --
22     A.    Or certainly aware of.
23     Q.    Or aware of?
24     A.    Yes.

Page 69

1      Q.    Do you recognize any of those
2  students from Exhibit 11?
3      A.    Oh, right here in front of me.
4         No, I don't. That exhibit does not
5  help me very much.
6      Q.    I think I will then show you the --
7      A.    Maybe I don't understand the
8  question. Are you saying that are there other
9  examples of 15 minutes rest per hour on that?
10     Q.    Yes.
11     A.    Yes, sir. I can see that.
12         MR. HERNANDEZ: Would you mark
13 that, please.
14
15         (Exhibit 15, Chart, marked)
16
17 BY MR. HERNANDEZ:
18     Q.    Let me show you Exhibit 15 which I
19 think is the chart that you were a little bit
20 more comfortable with.
21     A.    Right. Or at least it is just a
22 little bit easier for me to read.
23     Q.    There are a number of people who
24 are identified on this chart as getting this 15

18 (Pages 66 to 69)

**EXHIBIT 4**



**Baystate Medical Center**

*A Member of Baystate Health System*

Springfield, Massachusetts 01199

413-794-0000

**NEUROPSYCHOLOGY SERVICE**
TIMOTHY B. WHELAN, PH.D., DIRECTOR
MARK R. ELIN, PH.D., NEUROPSYCHOLOGIST
BRADLEY J. CRENSHAW, PH.D., NEUROPSYCHOLOGIST
Behavioral Health Associates – 4th floor
3300 Main Street, Springfield MA  01199-0001
(413) 794-7035 x3

**NEUROPSYCHOLOGICAL EVALUATION:**          RE:    MARLON, Diane
                                              DOB:  3/30/48
                                              DOE:  6/22/01

Assistant Dean Leavens
Dean of Academic Affairs
1215 Wilbraham Road
Springfield MA  01109-2684

Dear Academic Standard Committee:

Ms. Diane Marlon is a 53-year-old right-hand dominant woman with 16 years of education. The patient is a law student at WNEC, and she has been experiencing significant variability in her academic performance which led to this neuropsychological evaluation.

Salient developmental history reveals that she is the product of a normal gestational and delivery history. Developmental benchmarks were reached at appropriate stages and phases of maturation. When the patient was in the 6th grade she was involved in a motor vehicle accident which resulted in loss of consciousness and post-traumatic amnesia. She was pinned in the automobile, while other passengers were ejected from the automobile. Her only memory before the accident was when she was getting into the car with her cousins, and waking up in the hospital following the accident. She suffered from both an anterograde and retrograde amnesia. She remained in the hospital for several months with complications due to infection. She received surgery to her leg and received a skin graft as a result of this accident. She sustained no subsequent injuries, accidents, or diseases to the central or peripheral nervous system.

The patient attended preschool and describes herself as a poor speller, and dysphoretic in her word attack skills. In the 6th grade she was placed in a slower group and was subsequently placed into a regular reading group situation. When she attended junior college at Massa Community College she was on the Dean's List. At Arizona State she majored in the social science arts, and criminal justice was her final major. She has a bachelor's degree in criminal justice. Prior to law school, she was employed for over fifteen years as a paralegal.

The patient describes numerous separations, losses, and traumas in her life. Her father died in a tractor accident when she was 16 years of age. Her mother moved from Iowa to Arizona, and subsequently passed away from a blood clot during a hip operation. Her grandfather had passed away within a 6 month period of each other. In addition, her husband suffers from PTSD disorder from the Vietnam War with suicidal ideation. In the past, the patient has been harassed in the work place.

In 1999, the patient matriculated at WNEC law school. The first year for matriculation she reported that she was depressed. She experienced no support system being available to her, and she was experiencing significant pain in her hand. She went to the Family Life Center and

received anti-inflammatory and pain medications. Later this was diagnosed as being a carpal tunnel syndrome. In January, she developed panic attacks and she was unable to answer questions in the classroom situation "my mind went blank". She started taking Paxil for anxiety. During her first year of law school she failed receiving a 67 first year average. She was devastated and went to the dean. Interestingly, she was recommended for law school and moot court after receiving an A in her law processing class. However, this grade did not become part of her GPA. She received support from a law professor during this time period. She went to the disability service for recommendations at the school and she petitioned and was accepted back into the law school to repeat her first year. She was told at that time not to take anything other than first year classes, despite having passed all of her courses. During her finals this year she failed receiving a 67.5 year average  She knew the rules and facts, but she was unable to integrate this information in an effective and fluent manner in the time allotted.

## NEUROPSYCHOLOGICAL TEST RESULTS AND FINDINGS:

**Orientation:** The patient was oriented place, day of week, date, and reason for evaluation. Fund of personal and general knowledge was adequate. The patient reliably recalled recent and remote personal events in a temporal order.

**Behavioral Observations:** The patient was cooperative and developed a good working rapport with the evaluators. There was no evidence for psychotic mentation to include hallucinatory events which would impede her performance. She displayed a range of affect and mood was anxious. She was able to demonstrate a sense of humor and bright affect. She evidenced normal gait, station, and posture. Pencil grip was within normal limits.

**Attention/Concentration Abilities:** The directivity and selectivity of mental processes subsuming aspects of arousal vigilance, attention/concentration, and the ability to exclude extraneous stimuli from consciousness was evaluated in this patient. The patient's Working Memory index score was 86 (low average, 18th percentile) on the WAIS-III. Disinhibition of an otherwise habitual response was in the average range on the Stroop Test. Letter cancellation was within the average range. She made 4 errors for cancellation of geometric figures and shapes and 1 error for cancellation of numbers. Receptive language abilities were just within the average range on the Peabody Picture Vocabulary Test. Passage Comprehension was in the low average range on the Woodcock-Johnson Psychoeducational Test Battery. On the Connors Continuous Performance Test, discriminant functional analysis indicates that the results better matched a clinical than nonclinical profile. The chances were 55.4 out of 100 that a clinically significant attention/concentration problem exists.

**Sensory, Motor and Psychomotor Functioning:** The patient arrived at the testing session with a brace on her right hand due to her carpal tunnel syndrome. Her upper extremity tapping speed revealed a T score value of 38 and 54 in the right and left hand respectively. She received T score values of 35 and 61 for fine motor coordination abilities on the Pegboard tasks. On presentation of double simultaneous stimulation to the auditory, tactile, and visual spheres there were no extinctions. On a test for finger agnosia there was 1 extinction to the right and no extinctions to the left hand. Psychomotor and visual scanning abilities on trails A was in the average range for shifting numerical and alphabetical operations, and performance was in the average range on trails B. Executing a graphomotor and visual spatial response along a visual

spatial array for both written and oral abilities on the Symbol Digit Modalities Test, was performed .5 standard deviations above the mean respectively.

**Language Functioning:** Spontaneous speech was fluent, grammatically correct, and conveyed information effectively. Comprehension of questions and serial commands was normal. Repetition of high and low frequency phrases was normal. No paraphasias or circumlocutions were noted in spontaneous speech or during naming tasks. Expressive language abilities were just within the average range on the Boston Naming Test. Receptive language abilities yielded a standard score of 90 on the Peabody Picture Vocabulary Test placing her in the 25th percentile. On controlled word fluency, the patient performed in the average range for generating phonemically similarly sounding words on command.

**Learning and Memory:** Total acquisition on the California Verbal Learning Test was in the mildly impaired range (T = 38). Trial 1 was 1 standard deviation below the mean, trial 5 was in the average range. On list-learning B, a distractor list, she performed 2 standard deviations below the mean. Short delay free and short delay cued recall were 1 standard deviation below the mean respectively. Long delay free recall and long delay cued recall were 1 standard deviation below the mean respectively. Recognition memory was in the average range yielding 15 out of 16 hit items with only 2 false positive responses. She had a Savings score in the 77th percentile.

On a prose format and connected language measure for immediate recall she performed in the 34th percentile, and following a 30 minute delay period in the 45th percentile. Immediate recall of nonverbal information was in the 94th percentile, and following a 30 minute delay period in the 30th percentile.

**Visual-Spatial Functioning:** On the Hooper Visual Organization Test the patient received a T score value of 54. Complex visual perception and construction was in the average range on the Rey Drawing. It is important to underscore, however, that immediate recall and delayed recall evidenced a significant weakness in visual spatial memory, evidencing loss of contour and details of design. The patient received a mildly impaired T score value of 41 for recognition memory. The patient's Bender Gestalt was grossly within normal limits. Line continuation test was within normal limits.

**Self-Regulation/Executive Functions:** The patient performed normally on controlled word fluency. There was no significant incidence of socially inappropriate responses, perseverative errors, or loss of tasks set for shifting mental sets. Her performance on the Wisconsin Card Sorting Test was within the average range, yielding standard scores of 103 for Total Number of Errors, 107 Perseverative Responses, 99 Perseverative Errors, 93 Non-Perseverative Errors, and 94 Conceptual Level Responses, and greater than the 16th percentile for number of categories completed. Disinhibition of an otherwise habitual response on the Stroop Test was above the mean.

**Cognitive Functions:** The patient was administered the WAIS-III and received a Verbal IQ of 95, a Performance IQ of 121 (superior), and a Full Scale IQ of 106 (average). She received the following index score values: Verbal Comprehension 100, Perceptual Organization 114, Working Memory 86, and Processing Speed 125. Analysis of the patient's individual subtest scores based on age-correction norms are additionally beneficial to review:

Page 4 of 5
MARLON, Diane

| Verbal Tests | | Performance Tests | |
|---|---|---|---|
| Vocabulary | 12 | Picture Completion | 10 |
| Similarities | 9 | Digit Symbol | 13 |
| Arithmetic | 10 | Block Design | 14 |
| Digit Span | 6 | Matrix Reasoning | 13 |
| Information | 9 | Picture Arrangement | 15 |
| Comprehension | 10 | Symbol Search | 16 |
| Letter/Number Sequencing | 7 | | |

**Academic Achievement:**    The patient was administered the Woodcock-Johnson Psychoeducational Test Battery and received standard scores based on grade: Broad Reading standard score 72, Broad Math SS 86, and a Spelling standard score of 93 from the Wide Range Achievement Test.    Letter/Word Identification received a standard score of 63, Passage Comprehension 89, Calculations 94, and Applied Problem Solving abilities 82.

**SUMMARY AND CONCLUSIONS:** The patient performs in the average range of intellectual functioning with an average Verbal IQ and superior Performance IQ.  There is a statistically significantly 26 point difference between verbal abilities as compared to strength in perceptual analytic levels of functioning.  This is obtained by 2.0 percent of the population.  The patient's working memory capacities are in the low average range.  She evidences weakness in both verbal and nonverbal memory for encoding, consolidating, and accessing information.  Immediate recall of nonverbal information is well within the superior range of performance.  However, following a 30 minute delay period the patient loses important and sophisticated information for the contour and details of a design.

The patient has significant attention/concentration problems which will interfere with her capacity to encode, consolidate, and access information.  Receptive language abilities on the Peabody Picture Vocabulary Test are just within the average range of functioning.  Weaker performance in this area is more likely than not, due to the patient's visual spatial memory problems.

The patient has a specific learning disability in reading, math, and spelling.  This is a longstanding learning disability which has gone unnoticed.  The patient's visual spatial memory, linguistic learning weaknesses, attention/concentration problems, and problems encoding information together contribute to her longstanding learning disability.  She did have a serious accident when she was in the 6th grade, but to what degree this accounts for her present levels of cognitive functioning cannot be determined.  Following this accident, the patient reports that she was not evaluated for any cognitive or academic deficits.

1. These findings can account for the patient's difficulties that she is experiencing in law school.  She has been able to compensate for these deficits over the course of her training, however, in law school this will be more difficult because of the high level of integrative and analytic work that is required to do well on law school examinations.

Page 5 of 5
MARLON, Diane

Based on these evaluative findings, the following accommodations are recommended:

➢ It is necessary for the patient to have double time to take examinations, and

➢ Distraction free environment to take her examinations.

She would benefit from the use of a computer to take examinations, take classes where there is submission of a paper in lieu of a final examination, option to submit papers in lieu of a final examination, and if possible, circle multiple choice answer sheets. In addition, counseling by the school to assist her in test-taking skills would be helpful.

I believe that Ms. Marlon has significant learning disabilities which she has been struggling to compensate for over the years. This has lead to heightened levels of anxiety, frustration, depression, and low self-esteem. By identifying these problems, perhaps the school would be in a better position to accommodate to her learning situation in a supportive manner by helping her to remediate some of these deficits in her learning style. She can employ superior levels of cognitive functioning in her capacities to strategize nonverbal information. Within this domain, she is able to analyze, integrate, synthesize, and directly apply these cognitive strengths in a sophisticated manner.

Thank you very much for referring this very interesting patient, and if I can answer additional questions please do not hesitate to contact me.

MARK R. ELIN, PH.D., ABPN/ACPN
Diplomate, Board Certified in Neuropsychology
Clinical Neuropsychologist

Assistant Professor of Psychiatry
Tufts University School of Medicine

MRE/sb DR: 7/10/01 DT: 7/11/01C:\SANDY\NPSYCH\NPEVAL\Marlon, Diane.doc

**EXHIBIT 5**

JAMES GORDON
9/20/2002

Page 1

```
 1        FOR THE COMMONWEALTH OF MASSACHUSETTS

 2   Hampden: ss              District Court Division

 3                            C.A. No. 01-12-199-FHF

 4   * * * * * * * * * * * * * * * * * * * * * * * * * *

 5   DIANNE MARLON                        *

 6        Plaintiff,                      *

 7            vs.                         *

 8   WESTERN NEW ENGLAND COLLEGE          *

 9        Defendant,                      *

10   * * * * * * * * * * * * * * * * * * * * * * * * * *

11

12            DEPOSITION OF:  JAMES GORDON

13             CATUOGNO COURT REPORTING

14                1414 Main Street

15            Springfield, MA   01144-1011

16        September 20, 2002        2:05 p.m.

17

18

19

20

21               Rita I. Steinke

22              Shorthand Reporter

23

24
```

JAMES GORDON
9/20/2002

Page 18

BY MR. HERNANDEZ:
1  Q.    I just want to be clear.
2      There is only one set of academic
3  standards?
4  A.    Yes.
5  Q.    Where does that come from; how is
6  that promulgated?
7  A.    It actually predates my time at the
8  law shool, so I'm not sure how it was originally
9  adopted.
10     But it was adopted as part of a
11 body of rules called the Academic Standards of
12 the Law Shool that would have been approved by
13 the faculty.
14 Q.    During your tenure has that been
15 modified from time to time?
16 A.    Not to my -- I don't think so.
17 I've been here a long time.
18 Q.    How long have you been there?
19 A.    21 years.
20 Q.    Did you teach elsewhere before you
21 came to Western New England?
22 A.    As a graduate student in history I
23 taught.

Page 19

1  Q.    Can you tell me, where did you
2  obtain your law degree?
3  A.    My law degree is from the
4  University of Kentucky.
5  Q.    Have you had other teaching
6  responsibilities other than the graduate and
7  your teaching at the law school?
8  A.    No.
9  Q.    In terms of your term as chair of
10 academic standards, is that something which
11 changes from year to year?
12 A.    Yes.
13 Q.    So every year there will be a
14 different chair?
15 A.    Yes.
16 Q.    In terms of membership on the
17 committee, does that change every year as well?
18 A.    It may.  The usual rotation on our
19 committee is three years.  So a member would
20 come on and usually stay three years, although
21 it is not a hard and fast rule.  People can come
22 and go.
23 Q.    In terms of the disposition of the
24 petition, does the committee have latitude to

Page 20

1  prescribe whatever conditions it deems
2  reasonable?
3  A.    Yes.
4      I'm sorry.  Actually, there are
5  some limitations I think on what the committee
6  can do.
7      For example, the committee can't
8  expunge the student's academic record.  But
9  generally in terms of conditions for
10 readmission, there is wide latitude for the
11 committee.
12 Q.    So it is not limited to what the
13 student has requested.  Say a petition is just
14 for readmission, the committee can certainly
15 carve out whatever it wants in terms of the
16 conditions for that readmission?
17 A.    Yes.
18 Q.    Let me show you what has been
19 previously marked as Exhibit 24.
20 A.    Yes.  This is the letter I sent
21 reporting to Dianne the results of the committee
22 decision.
23 Q.    That was based on the process as
24 you have described it?

Page 21

1  A.    Yes.
2  Q.    Sir, could you tell me your
3  recollection of the basis for the decision to
4  readmit her?
5  A.    It was more than a year ago.
6      Again, I'm more comfortable
7  reporting what I was thinking about.  I don't
8  know for sure what others on the committee were
9  thinking about.
10     I frankly was a little concerned
11 whether Dianne would make it through law shool.
12 So on the capacity part of the standard, I had
13 some concerns.
14     On the part of the standard that
15 goes to whether there were circumstances beyond
16 the control of the student that contributed to
17 the failure, I was convinced in Dianne's case
18 that there were.
19     The things that she told us about
20 her arm and her hand and the way that might have
21 affected her ability to perform, and also the
22 stresses in her family that she reported to us.
23     I remember she told us about having
24 some emotional problems with a son and that her

6 (Pages 18 to 21)

**EXHIBIT 6**

# **Addendum**

to Petition Dated 7/12/01 for an Exception to

the Rules for Academic Dismissal.

Dianne S. Marlon

Dianne S. Marlon
516 Grayson Dr.
Springfield, MA  01119

July 12, 2001

Asst. Dean Leavens
Dean of Academic Affairs
1215 Wilbraham Rd.
Springfield, MA  01109-2684

Re: **Addendum** to Petition Dated 7/12/01 for an Exception to the
Rules for Academic Dismissal.

Dear Dean Leavens and the Academic Standards Committee:

Attached is Dr. Mark Elin's letter entitled
"Neuropsychological Evaluation" with test results and with a list
of necessary accommodations and recommendations.

According to physicians Dr. Patel and Dr. Elin, the
following accommodations are requested:

**NECESSARY Accommodations**:
1. Double time to take examinations;
2. Distraction free environment to take the examinations;
3. Use of computer;
4. Schedule tests at least two days apart;
5. Continue with note taker.

**BENEFIT From:**
1. Taking classes where there is submission of a paper in
   lieu of a final examination;
2. Option to submit papers in lieu of a final examination;
3. Circle multiple choice answer sheets;
4. Counseling in test-taking skills;
5. Voice activated computer;
6. Extra rest times during examinations.

Sincerely,

Dianne S. Marlon

1

**EXHIBIT 7**

1          FOR THE COMMONWEALTH OF MASSACHUSETTS

2     Hampden: ss              District Court Division

3                             C.A. No. 01-12-199-FHF

4     * * * * * * * * * * * * * * * * * * * * * * * * *

5     DIANNE MARLON                        *

6          Plaintiff,                      *

7               vs.                        *

8     WESTERN NEW ENGLAND COLLEGE          *

9          Defendant,                      *

10    * * * * * * * * * * * * * * * * * * * * * * * * *

11

12

13          DEPOSITION OF:  PETER ADOMEIT

14            CATUOGNO COURT REPORTING

15               1414 Main Street

16           Springfield, MA  01144-1011

17       September 26, 2002      3:10 p.m.

18

19

20

21

22

23               Rita I. Steinke

24            Shorthand Reporter

PETER ADOMEIT
9/26/2002

Page 18

1  interrogatory to that extent is not accurate.
2          Eventually after hearing everything
3  about this case, I don't think her statement
4  that her disabilities restricted my ability to
5  perform under time constraints, on Page 7.
6          I don't think her problem was tight
7  time constraints. I think her problem was the
8  inability to engage in legal analysis properly.
9          And so although that doesn't go to
10 credibility, I just simply disagreed with that
11 after hearing the entire case and after looking
12 at the all of the evidence. I did not think
13 that this was a time problem at all, but an
14 analysis problem.
15         I'm not sure I have answered your
16 question, but that is the best I can do at this
17 point. You had handed me another document and I
18 should look at the Addendum too. Excuse me.
19         Yes.
20 BY MR. HERNANDEZ:
21     Q.   If I understand correctly from the
22 items you pointed out, you disagree with a
23 number of her assertions concerning her
24 qualifications of her being a qualified

Page 19

1  individual, her having a disability under the
2  ADA. The only factual assertions that I think I
3  understood you to challenge was using the
4  October 1999 date as when the law school
5  accommodated her?
6     A.   Yes. That is what jumped out at
7  me.
8     Q.   And it was in the course of the
9  hearing it became clear that everybody agreed
10 that in fact it was October of 2000 that the
11 accommodation was made; is that correct?
12    A.   Yes. We eventually through
13 questioning got her to acknowledge that that
14 date was wrong.
15    Q.   You said that this affected her
16 credibility. Could you explain what you mean by
17 affected her credibility?
18    A.   Yes. This and one other incident
19 during the hearing.
20         Before this petition I was not
21 aware of the disability background of that case.
22 Because I don't know Ms. Marlon. And so when I
23 read this thing for the first time, the picture
24 it creates is that she went to Bonni Alpert.

Page 20

1          And then in October of '99, which
2  was her first year at the law school, that she
3  had in response to her visit to Disabilities
4  Services, the law school accommodated her an
5  extra 15 minutes and that they were standard
6  ones and so on.
7          And so she left -- she created the
8  impression with this document, that as far as
9  back in October of 1999 she had asked for these
10 accommodations. And I didn't know that was true
11 or not, but that didn't make any sense to me.
12         So, it just didn't look right. And
13 so that's why I asked -- we asked questions.
14    Q.   Was it your impression that somehow
15 by using the October 1999 date she was trying to
16 mislead the committee in some way?
17    A.   Well, I was misled, whether she
18 intended to or not. Although she didn't correct
19 it immediately. I mean, it took some
20 questioning before we found out that this was
21 not the right date.
22    Q.   Were there a number of questions to
23 ascertain whether at that point she was talking
24 about October '99 or 2000?

Page 21

1     A.   Yes.
2     Q.   And when she explained during the
3  course of the questioning that in '99 she had
4  switched to part-time status --
5     A.   Yes.
6     Q.   -- that is what '99 could refer to.
7  But in terms when it was pointed out to her that
8  this was with respect to the extra 15 minutes.
9  She agreed that was in October of 2000?
10    A.   That's correct.
11    Q.   Now, you said further that you did
12 not feel that she met the legal test for
13 disability under ADA. Could you explain that?
14    A.   Sure. She functions normally in
15 the real world. She holds a job. She is in a
16 family. She has been a paralegal. So, she is
17 able to go about doing what people do in the
18 real world.
19    Q.   And to your mind that satisfies
20 that once that condition exists, one cannot
21 claim to be handicapped under the ADA?
22    A.   That is what the United States
23 Supreme Court has indicated. That if she
24 doesn't have a significant impairment of a usual

6 (Pages 18 to 21)

PETER ADOMEIT
9/26/2002

Page 26

1    A.    Yeah, I know it exists.
2    Q.    Are you aware that there are
3  decisions interpreting Section 504 of The
4  Rehabilitation Act of 1973, as it applies to the
5  institutions of higher learning?
6    A.    I know that there is such a
7  decision exists, yes.
8    Q.    And are you aware that their
9  decisions in fact find that conditions such as
10  dyslexia or learning disabilities may constitute
11  handicaps covered by Section 504?
12    A.    It depends on the level of
13  impairment.  Yes.
14    Q.    But you would concur that federal
15  law has been found to apply for law shools and
16  to medical schools, for example, in the area of
17  handicapped discrimination?
18    A.    I assume that that is a true
19  statement.  I don't have the citations, but I
20  assume that is true.
21    Q.    And would you concur that, in fact,
22  let's take the first circuit, has found that a
23  student in a medical school, for example, who
24  suffers from a learning disability may be

Page 27

1  considered handicapped within the meaning of
2  federal law?
3    A.    I know such a case exists.
4    Q.    Okay.
5    A.    I don't know the case.
6    Q.    Okay.
7          Now, could you take a look at
8  Exhibit 32 in front of you.
9    A.    (Witness complies with attorney's
10  request.)
11          Okay.
12    Q.    You read Exhibit 32?
13    A.    I did.
14    Q.    Prior to consideration of the
15  petition or in the course of consideration of
16  the petition?
17    A.    Oh, absolutely.  Yes.
18    Q.    During the course of the
19  deliberations of the committee, was there any
20  discussion of Exhibit 32?
21    A.    I used Exhibit 32 in arriving at my
22  own conclusion.  Whether I specifically referred
23  to it in the penning of my conclusion, I really
24  cannot remember.  But I clearly remember reading

Page 28

1  this thing over and over a number of times and I
2  found it quite useful in arriving at my
3  decision.
4    Q.    In what way?
5    A.    Well, it indicates that she lacked
6  or had a difficult time with higher cognitive
7  abilities.  The high level of intricate and
8  analytic work that is required to do well on law
9  school examinations.  And that was consistent
10  with her L-SAT and was consistent with the
11  report that we had from Eric Grouvin, one of her
12  professors.
13          And that the doctor's report
14  indicates that she has visual spatial memory
15  issues, weaknesses.  Linguistic learning
16  weaknesses, attention concentration problems and
17  problems in coding information together.
18          So that this plus the L-SAT plus
19  what Eric Grouvin had indicated to us when he
20  went over her exam, all formed a consistent
21  picture.
22    Q.    Well, did you read the indication
23  that because of these particular issues, in
24  order properly to evaluate Ms. Marlon it was

Page 29

1  necessary for her to have double time to take
2  the examinations?
3    A.    Well, I saw that he said that.
4  Yes.
5    Q.    Did you disagree with that
6  conclusion?
7    A.    I did.
8    Q.    Why was that?
9    A.    Because what Eric Grouvin had
10  indicated to us was that her final exam
11  indicated an inability to engage in legal
12  analysis.  He said that her exam was completely
13  devoid of legal analysis and that she could not
14  take facts, take law and synthesize the two of
15  them.  And that is not an issue of time, but
16  that is an issue of intellectual issues.
17          Secondly, in both semesters of both
18  years in the first semester, she did passing
19  work in all of her courses.  Well above the
20  threshold of 70 for continuation into the next
21  year.
22          So that the picture that I got from
23  her was that if she really worked very hard in
24  law school, she could perform 70 or above.  And

8 (Pages 26 to 29)

CATUOGNO COURT REPORTING SERVICES
Springfield, MA                Worcester, MA      Boston, MA                                    Providence, RI

PETER ADOMEIT
9/26/2002

Page 30

1  she did that twice. First year, first semester.
2  Her second year, second semester.
3        But that the level of effort that
4  she had to put in to get a requisite output, in
5  her case it is higher than your average law
6  student, and that she was unable to sustain that
7  continued effort from the first year and then
8  the second year.
9        So that in my view it was not a
10 time issue. Because she wrote exams. She wrote
11 words down. But that when she wrote the words
12 down, she didn't engage in appropriate legal
13 analysis.
14    Q.    Well, sir, with all due respect,
15 you are not a neuropsychologist?
16    A.    No. No, of course not.
17    Q.    And it would be fair to say that
18 Dr. Elin is a board certified neuropsychologist?
19    A.    Yes.
20    Q.    And he is certainly an individual
21 who is qualified to determine whether an
22 individual has a learning disability or not?
23       MS. SMITH: Objection.
24       THE WITNESS: I can only assume

Page 31

1  that is the facts. I don't know the gentleman.
2  BY MR. HERNANDEZ:
3    Q.    You have no reason to doubt that?
4    A.    No, I have no reason to doubt that.
5    Q.    And you have no reason to doubt
6  that when he suggests that in order to properly
7  be evaluated she requires double time to take
8  examinations, that is probably a correct
9  assessment based on his qualifications as a
10 neuropsychologist?
11       MS. SMITH: Objection.
12       THE WITNESS: I did not believe it
13 was a correct assessment of the problems that we
14 were seeing in her law school performances.
15 BY MR. HERNANDEZ:
16    Q.    But had she been given double time
17 for any exams to your knowledge, sir?
18    A.    To my knowledge, I don't believe
19 so.
20    Q.    So it is fair to say that at no
21 time was she tested in accordance with the
22 recommendations of Dr. Elin?
23       MS. SMITH: Objection.
24       THE WITNESS: Well, his

Page 32

1  recommendations are double time for exams. And
2  my understanding was that she had not received
3  double time, but that she had received some
4  extra time.
5        And that secondly the
6  distraction-free environment, my understanding
7  was that she got a distraction-free environment.
8        And third, although he doesn't make
9  a recommendation, I knew from hearing the case
10 that she had been given a -- able to type her
11 exams. But he doesn't mention that in here.
12 BY MR. HERNANDEZ:
13    Q.    You knew she had several
14 disabilities, right? She had the carpal tunnel
15 syndrome problem?
16       MS. SMITH: Objection.
17       THE WITNESS: I knew that she had a
18 problem with her dominant hand, whichever it is.
19 I believe her right hand.
20 BY MR. HERNANDEZ:
21    Q.    Okay. So, you knew that there were
22 accommodations which the law school had offered
23 with respect to that?
24    A.    Yes.

Page 33

1    Q.    And in fact it had allowed her to
2  have 15 minutes of rest time during each exam?
3    A.    My understanding was 15 minutes per
4  hour.
5    Q.    Per hour of exam?
6    A.    Of exam.
7    Q.    For rest.
8    A.    That was what I was told.
9    Q.    Okay. And you understood, of
10 course, that that was rest time, not exam that
11 she was given?
12       MS. SMITH: Objection.
13       THE WITNESS: I don't know what you
14 are saying.
15 BY MR. HERNANDEZ:
16    Q.    Well --
17    A.    Whether she had to leave the room?
18       Is that what you are asking?
19    Q.    Did you inquire of what kind of
20 time she was given as extra time, so to speak?
21    A.    It is told to us. I don't remember
22 inquiring, I remember being informed during the
23 process of hearing the case.
24       And my knowledge comes from hearing

9 (Pages 30 to 33)

PETER ADOMEIT
9/26/2002

Page 46

1  readmitted. And it speaks about what happens
2  upon their readmission.
3          Section 2 talks about other cases
4  of readmission.
5      A.   Yes. Can I see this again?
6      Q.   Yes.
7      A.   One talks about students who are
8  dismissed who were then readmitted to retake the
9  entire first year.
10     Q.   Right. But it appears that
11 Section 2 contemplates other forms of
12 readmission?
13     A.   Oh, yes.
14          You can ask a student -- first of
15 all the second year, or you could have them
16 retake some but not all of their first year
17 courses. Okay?
18     Q.   I would like to turn back then to
19 Dr. Elin's report, Exhibit 32. And isn't it
20 fair to say that Dr. Elin concludes that
21 Ms. Marlon has superior levels of cognitive
22 functioning?
23          MS. SMITH: Objection.
24          THE WITNESS: I'm sorry. I don't

Page 47

1  see where you are. What page?
2  BY MR. HERNANDEZ:
3      Q.   I'm looking at the last page. And
4  I will read this with you. The paragraph which
5  begins, I believe that Ms. Marlon has
6  significant learning disabilities which she has
7  been struggling to compensate for over the
8  years.
9          This has left heightened levels of
10 anxiety, frustration, depression and low
11 self-esteem.
12          By identifying these problems,
13 perhaps the school would be in a better position
14 to accommodate to her learning situation in a
15 supportive manner by helping her to remediate
16 some of these deficits in her learning style.
17          She can employ superior levels of
18 cognitive functioning in her capacities to
19 strategize nonverbal information.
20          Within this domain she is able to
21 analyze, integrate, synthesize and directly
22 apply these cognitive strengths in a
23 sophisticated manner.
24     A.   If you are asking me to interpret

Page 48

1  what he is saying, I read this report as saying
2  that she has had and will continue to have if
3  readmitted significant problems in law school.
4      Q.   Certainly if she is not
5  accommodated she will have significant problem?
6          MS. SMITH: Objection.
7          THE WITNESS: In law school this
8  will be more difficult because of a high level
9  of integrative and analytic work that is
10 required to do well in law school.
11 BY MR. HERNANDEZ:
12     Q.   Well, as you are aware, of course,
13 she was able to on shorter exams, able to
14 perform perfectly?
15     A.   Yes.
16     Q.   And certainly she was recommended
17 for the Law Review because of her class
18 performance and learning process; is that the
19 case?
20     A.   Yes.
21          Well, I don't know if she was
22 recommended, but someone considered recommending
23 her. I don't know from my own knowledge whether
24 she was actually recommended or not. I can't

Page 49

1  testify to that. I just don't know.
2      Q.   Well, were you aware that Beth
3  Cohen had recommended her for Law Review?
4      A.   I don't know whether that is what
5  the letter says. If you have the letter, the
6  letter would be -- whatever the letter says, it
7  says.
8      Q.   That is Exhibit C to the Petition,
9  which is your Exhibit 35.
10     A.   Okay.
11     Q.   It says that she was one of four
12 students that she recommended for Law Review.
13     A.   Okay.
14     Q.   Certainly that suggests that at
15 least in her oral presentations she seemed to
16 perform perfectly well in law school.
17          MS. SMITH: Objection.
18          THE WITNESS: She performed well in
19 the Lawyering Process course. That is correct.
20 BY MR. HERNANDEZ:
21     Q.   Well, to be recommended for Law
22 Review suggests more than that, doesn't it?
23     A.   It is basically the ability to
24 write.

13 (Pages 46 to 49)

PETER ADOMEIT
9/26/2002

Page 50

1    Q.    Okay.
2    A.    And she clearly impressed Beth
3  Cohen.
4    Q.    And she also impressed Richard
5  Cole, didn't she?
6        MS. SMITH: Objection.
7        THE WITNESS: Have you got the Cole
8  letter?
9  BY MR. HERNANDEZ:
10   Q.    That is Exhibit D.
11   A.    Certainly in the first semester she
12  got a 75 from Professor Cole.
13   Q.    And he felt that she certainly
14  performed better in class than she had on her
15  written exam; is that correct?
16   A.    Yes.
17   Q.    Which would certainly be classic
18  examples of learning disabilities, right?
19        MS. SMITH: Objection.
20        THE WITNESS: I can't agree with
21  that.
22        The case that she gave us the first
23  time was that she had serious personal
24  difficulties with both her husband and son back

Page 51

1  home in Nevada, and that she had problems with
2  her hand. And the combination of those issues
3  caused all her grades to go down in the second
4  semester.
5  BY MR. HERNANDEZ:
6    Q.    Okay.
7    A.    She made no claim of a learning
8  disability to my knowledge until she had failed
9  out of law school.
10   Q.    My question though is that based on
11  your experience, a discrepancy between classroom
12  performance and demonstration of ability in the
13  classroom and written examinations is consistent
14  with the existence of a learning disability,
15  isn't it, sir?
16        MS. SMITH: Objection.
17        THE WITNESS: I just don't know.
18  BY MR. HERNANDEZ:
19   Q.    Okay.
20   A.    I have seen a lot of people who are
21  very good in class who are not very good on
22  written exams.
23   Q.    But certainly those observations
24  would be consistent with Dr. Elin's conclusions,

Page 52

1  wouldn't they?
2        MS. SMITH: Objection.
3        THE WITNESS: Well, I happen to
4  know for a fact that she claimed to have had
5  serious problems with both her husband and her
6  son. And that I thought was why her grades went
7  down in the first year, and that is why we
8  re-admitted her.
9  BY MR. HERNANDEZ:
10   Q.    There was no question of a learning
11  disability at that time, was there?
12   A.    No. We thought we were dealing
13  with somebody who was 2000 miles from home and
14  was without emotional support.
15   Q.    Right.
16   A.    With a husband and teenage son back
17  home. The husband goes to an --
18   Q.    Right.
19   A.    -- and the teenage son is having
20  problems. And I inferred from all of this that
21  this would have series impact on Ms. Marlon.
22   Q.    As could be understood. And that
23  is why the school admitted her back the first
24  time, correct?

Page 53

1    A.    And I was a party to that decision.
2    Q.    Correct. And the first time that
3  the issue of learning disability actually came
4  up was in her second petition; isn't that true?
5    A.    We did not know -- the committee
6  did not know of any claim to a learning
7  disability until after the grades had come out
8  in her second year and that she had in effect
9  failed out of law school twice.
10   Q.    That was the first time that the
11  issue of learning disability actually came up,
12  isn't it?
13   A.    That was my understanding --
14   Q.    Okay.
15   A.    -- in looking at the record.
16   Q.    Would you take a look at
17  Exhibit 33.
18   A.    (Witness complies with attorney's
19  request.) Okay.
20   Q.    Did the committee consider
21  Professor Jones' letter?
22   A.    I don't remember ever seeing it
23  before today.
24   Q.    Do you know why not?

14 (Pages 50 to 53)

**EXHIBIT 8**

**RESERVED**