| | |
|---|---|
| DIANNE MARLON,<br>     PLAINTIFF,<br>VS.<br>WESTERN NEW ENGLAND COLLEGE,<br>     DEFENDANT | Case No.: 01-12199-FHF |

FILED
CLERK'S OFFICE

2003 JUN -3 A 10: 44

U.S. DISTRICT COURT
DISTRICT OF MASS

### DEFENDANT'S MOTION FOR LEAVE OF COURT TO SUBMIT THE ATTACHED REPLY BRIEF IN RESPONSE TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now comes the Defendant, Western New England College, through its attorney, and respectfully requests Leave of this Court to file the attached reply brief in response to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, in conformance with Massachusetts Local Rule 7.1(B)(3).

Respectfully submitted,

Western New England College
By its attorney:

Dated: May 30, 2003

_Cheryl I. Smith_
Cheryl I. Smith
BBO No. 542492
Western New England College
1215 Wilbraham Rd.
Springfield, MA 01109
(413) 782-1542

### CERTIFICATE OF SERVICE

I, Cheryl I. Smith, hereby certify that I have this day sent a copy of the foregoing document by first class mail, postage prepaid and facsimile, directed to all counsel of record.

Dated: May 30, 2003

_Cheryl I. Smith_
Cheryl I. Smith

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DIANNE MARLON, )
    PLAINTIFF, )
VS. )
WESTERN NEW ENGLAND ) Case No.: 01-12199-FHF
COLLEGE, )
    DEFENDANT )
_____ )

### DEFENDANT WESTERN NEW ENGLAND COLLEGE'S REPLY BRIEF TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Western New England College (hereinafter "College"), respectfully submits the following to this Honorable Court in response to Plaintiff's Opposition to the College's Motion for Summary Judgment.

### 1. THE COLLEGE DID IN FACT AFFORD PLAINTIFF THE OPPORTUNITY TO RECORD PLAINTIFF'S CLASSES VIA VOICE-ACTIVATED RECORDER.

In Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (hereinafter "Opposition") Plaintiff challenges the College to support the truth of its statement of fact on page five of its Motion for Summary Judgment that "Plaintiff was issued...the opportunity to record her classes via a voice-activated recorder." The College hereby submits to this Court, Plaintiff's own deposition testimony, as evidence that Plaintiff was, in fact, afforded the use of a voice-activated recorder. The testimony is as follows:

> Q. (By counsel for the College): The doctor said you may use a voice-activated recorder. Did you ever use the voice-activated recorder during classwork at Western New England College?
>
> A. Yes, I did. (Exhibit 1, Pg. 136 Ln. 17-23)

1

Thus, the College submits that, as exhibited in Plaintiff's own deposition testimony, that Plaintiff was in fact afforded the opportunity to use a voice-activated recorder in accordance with Dr. Patel's note of September 29, 2000. (Exhibit 2)

## II. PLAINTIFF USES AN INCONSISTENT STANDARD TO DETERMINE WHETHER PLAINTIFF QUALIFIES AS A DISABLED INDIVIDUAL UNDER BOTH THE ADA AND THE REHABILITATION ACT.

On page eight of Plaintiff's Opposition, Plaintiff correctly states that to be entitled to the protections of the ADA and related statutes, Plaintiff must "put forth credible that (Plaintiff) suffers from a physical or mental impairment that "substantially limits one or more major life activities." As the College stated in its Motion for Summary Judgment, the Supreme Court has ruled that in order to qualify as being "substantially limited" in a major life activity, Plaintiff needs to prove an inability to work in a "broad range of activities that are of central importance to most people's lives." *Toyota Motor Manufacturing, Kentucky, Inc. v. Ella Williams*, 534 U.S. 184, 197, *Sutton v. United Air Lines Inc.*, 527 U.S. 471, 479 (1999). However, on page nine of Plaintiff's Opposition, Plaintiff erroneously states that Plaintiff only needs to show that "these disabilities interfere with one or more major life activities."

According to Toyota, the word "substantial" clearly precludes impairments that interfere in only a minor way with the performance of tasks from qualifying as disabilities. *Id*. Furthermore, Plaintiff states on page nine of Plaintiff's Opposition that "the record clearly demonstrates that these impairments have indeed interfered with (Plaintiff's) major life activities". Not only is this the wrong legal standard, but Plaintiff fails to offer a scintilla of evidence to this Court to support this erroneous conclusion.

Moreover, case law has determined that it is insufficient for individuals attempting

2

to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those "claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." (emphasis added) *Toyota*, 534 U.S. at 199. Plaintiff has failed to do this. Thus Plaintiff's legal analysis on page nine of Plaintiff's Opposition does NOT articulate the appropriate standard as promulgated in *Toyota* and *Sutton,* and is void of any substantive fact to support Plaintiff's flawed legal analysis.

### III. PLAINTIFF'S REQUESTS FOR ADDITIONAL TIME ON PLAINTIFF'S EXAMINATIONS WERE RELATED TO PLAINTIFF'S PHYSICAL CONDITION, NOT PLAINTIFF'S MENTAL CONDITION.

On page five of Plaintiff's Opposition, Plaintiff submits that while the fifteen minutes of rest per every hour examination that Plaintiff was afforded "represent(s) an effort, albeit meager, to address (Plaintiff's physical condition), (the accommodations) plainly did not address (Plaintiff's) limitations arising from (Plaintiff's "mental condition"). In accordance with the Dr. Patel's note dated September 29, 2000, Plaintiff was provided with a note taker, increased time during exams, the opportunity to record her classes via a voice-activated recorder, and the use of a school word processor to type Plaintiff's examinations. Plaintiff affirms through Plaintiff's deposition testimony that these accommodations were in fact provided by the College. (Exhibit 1, Pg. 136, Ln 17-20, Pg. 154-155). Dr. Patel, as exhibited through his deposition testimony, was Plaintiff's treating physician for Plaintiff's "physical condition", not Plaintiff's "mental condition". (Exhibit 3, Pg. 38). Thus, the College had no duty to provide accommodations for Plaintiff's alleged "mental condition" because the documentation

3

provided to the College in the Fall of 2000 regarding Plaintiff's alleged "disabilities" only pertained to Plaintiff's physical condition.

### IV. PLAINTIFF NEVER REQUESTED ACCOMMODATIONS FOR ANY ALLEGED "MENTAL CONDITION" OR "SPECIFIC LEARNING DISABILITY" UNTIL AFTER PLAINTIFF'S SECOND ACADEMIC DISMISSAL.

Plaintiff attempts to conclude that just because the Director of SDS, Dr. Bonnie Alpert (hereinafter "Dr. Alpert"), was informed that Plaintiff was seeking treatment for a "mental condition", Plaintiff was entitled to the protections of the ADA and Rehabilitation Act. Once again, this is an inaccurate interpretation of the law and the facts of this case. Dr. Alpert, in her deposition testimony, acknowledged that when Plaintiff visited SDS for the first time July 12, 2000, Dr. Alpert discussed Plaintiff's "mental condition" with Plaintiff, and was informed by the Plaintiff "that (Plaintiff) was on medication and being treated and that things seemed under control. Things were under control". (Exhibit 4, Pg. 74 Ln. 19-24).

In addition, discussing Plaintiff's "mental condition" does not impose an obligation on the College to offer Plaintiff accommodations. See *Goodwin v. Keuka College,* 929 F. Supp. 90, 94 (W.D.N.Y. 1995) (Court held that no obligation to accommodate Plaintiff arose from knowledge that plaintiff was seeking testing for learning disability). Similarly, Assistant Dean Sykes, in her deposition testimony, testified to the fact that Plaintiff never discussed with Assistant Dean Sykes any "feelings of depression", "anxiety", or "panic attacks". (Exhibit 5, Pg. 80 Ln 10-18). Without a request for specific accommodations for Plaintiff's "mental condition", the College had no obligation to provide any accommodation, and thus the College did not discriminate against Plaintiff.

4

*Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432, 437 (6th Cir. 1998), *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 795 (1st Cir. 1992).

Lastly, the College once again stresses to this Court that Plaintiff <u>only</u> sought specific accommodations for Plaintiff's alleged " specific learning disability" after Plaintiff was academically dismissed a <u>second</u> time in June 2001, when Plaintiff failed to meet the Law School's academic standards while repeating the first year curriculum. Without receiving a specific request for an accommodation as to a "specific learning disability" from Plaintiff while Plaintiff was an enrolled student, the College had no obligation to provide one. *Kaltenberger*, 162 F.3d at 437.

Thus, the College respectfully submits that the Plaintiff fails to raise any genuine issues of material fact, and thus the College is entitled to Summary Judgment as a matter of law.

Respectfully submitted,

Western New England College
By its attorney:

Dated: May 30, 2003

*Cheryl Smith* (signature)

Cheryl I. Smith
BBO No. 542492
Western New England College
1215 Wilbraham Rd.
Springfield, MA 01109
(413) 782-1542

## CERTIFICATE OF SERVICE

I, Cheryl I. Smith, hereby certify that I have this day sent a copy of the foregoing document by first class mail, postage prepaid and facsimile, directed to all counsel of record.

Dated: May 30, 2003

*Cheryl Smith* (signature)

Cheryl I. Smith

1

DIANNE MARLON
9/26/2002

136

1     A.     Right.

2     Q.     Why would you not use --

3     A.     Right.

4            If you are in a quiet room and you
5     have a voice-activated software, you are going
6     to be able to pick things up. If you are in a
7     room -- are you stopping me?

8     Q.     I'm sorry. You said
9     voice-activated software. Your doctor
10    recommended voice-activated recorder?

11    A.     Right.

12    Q.     Are they two different devices?

13    A.     Yes, they are two very different
14    devices.

15    Q.     Do you own both?

16    A.     I do own both.

17    Q.     Let's just confine the discussion
18    here to what the doctor recommended in
19    September. The doctor said you may use a
20    voice-activated recorder. Did you ever use the
21    voice-activated recorder during classwork at
22    Western New England College?

23    A.     Yes, I did.

24    Q.     And what classes were those?

154

1    A.    A note taker was provided and Bonni
2  Alpert did talk to Dean Sykes.
3    Q.    And it's my understanding, and I
4  believe your answers to interrogatories indicate
5  that Bonni Alpert spoke to Nancy Sykes and you
6  were given additional time for exams, a fifteen
7  minute break for every hour tested, am I
8  correct?
9    A.    Rephrase please.
10   Q.    Were you given a fifteen minute
11 break for every hour of testing?
12   A.    From Dean Sykes?
13   Q.    From the college?
14   A.    It came from Dean Sykes.
15   Q.    But you were given a fifteen minute
16 break for every hour of testing?
17   A.    Fifteen minute break an hour,
18 right.
19   Q.    And your doctor had suggested a
20 break for every twenty minutes of writing, am I
21 correct?
22   A.    Right.
23   Q.    Isn't it true that you were able to
24 take your tests in a distraction free

                                                                    155

1    environment?
2         A.    Yes, it was.
3         Q.    And isn't it true that you were
4    able to word process your exams?
5         A.    What do you mean word process?
6         Q.    Use the college's computer to type
7    your exams as opposed to taking them by use of a
8    pencil or pen?
9         A.    Yes.
10        Q.    So when you say you were concerned
11   in instant matters that there were no ideas
12   exchanged between this office and the law
13   school, what are you concerned about?
14              MR. HERNANDEZ:  Objection to form.
15              THE WITNESS:  Two major areas.
16        One there should have been a conversation
17        dealing with Dean Sykes did not allow the
18        software which Bonni Alpert had put into
19        the notification to faculty as a
20        recommendation.
21              Plus there was no discussion
22        dealing with the ineffectiveness of the
23        note taker.
24        Q.    (By Ms. Smith)  Is it your

2



# FAMILY CARE MEDICAL CENTER®

1515 Allen Street • Springfield, MA 01118 • (413) 783-9114

PATIENT'S NAME: Marlon, Dianne

Seen and Treated at the F.C.M.C. on, 9-29-00

REMARKS: Patient may use voice activated recorder during class. She is to avoid constant writing motion

RECOMMENDATION: Writing breaks every 20 mins.

Signature: Dr. Peter MD/CB
Date: 9-29-00

CERTIFIED

3

VIJAY PATEL, M.D.
12/19/2002

38

1     Q.     Did she ever discuss with you any
2 learning disability that she had at the time,
3 Dr. Patel?
4     A.     No.
5     Q.     Did she ever discuss with you any
6 depression?
7     A.     She didn't tell me anything about
8 her symptoms of depression with me.
9     Q.     So you did not know of any symptoms
10 of depression?
11     A.     No. But in fact she was seen there
12 before by other doctor and she was treated. But
13 she didn't tell me anything about that.
14     Q.     So when you saw her from September
15 2000 through June 2001 when you were her
16 treating physician on those dates, you mentioned
17 September 23rd, September 29th, the date in
18 October, this date in June. She never discussed
19 any symptom of depression with you?
20     A.     No, no. Because we -- because it
21 was a walk-in so we don't ask her anything in
22 detail. This was not like a physical
23 examination. She just came in because of
24 specific complaints.

4

**BONNIE ALPERT**
**9/19/2002**

74

1  documented disability interferes with a major
2  life function to learning?
3       A.   No. That is up to the qualified
4  professional who gives me the documentation.
5       Q.   Based on that documentation though,
6  you can make the judgment as to whether an
7  accommodation might be appropriate?
8       A.   Yes.
9       Q.   And that is why in this case you
10 felt that an accommodation to Dianne's writing
11 might be appropriate; is that correct?
12      A.   Might be appropriate, yes.
13      Q.   In your intake, you note both
14 psychiatric depression and carpal tunnel. The
15 documentation we have seen deals with carpal
16 tunnel. Did you ever request or obtain any
17 information pertaining to her depression?
18      A.   I did not.
19      Q.   Did you discuss her depression with
20 her?
21      A.   Yes. And I was told that she was
22 on medication and being treated and that things
23 seemed under control. Things were under
24 control.

5

NANCY SYKES
9/19/2002

80

| | | |
|---|---|---|
| 1 | Q. | You met with her on November 3rd? |
| 2 | A. | Yes. |
| 3 | Q. | You met with her in late August of 2000 to talk about a note taker? |
| 5 | A. | Yes. |
| 6 | Q. | At any time from August 2000 until June of 2001, did Ms. Marlon discuss any feelings of depression that she had with you? |
| 9 | A. | No. |
| 10 | Q. | You testified that your role was as a counselor for students? |
| 12 | A. | Yes. |
| 13 | Q. | Did she ever discuss any anxiety that she had? |
| 15 | A. | No. |
| 16 | Q. | Did she ever discuss panic attacks from which she was suffering? |
| 18 | A. | No. |
| 19 | Q. | Did she ever discuss with you any learning disabilities that she suspected she might have? |
| 22 | A. | No. |
| 23 | Q. | Did she ever request any testing for any learning disabilities? |

Case 1:01-cv-12199-DPW    Document 32    Filed 06/03/2003    Page 20 of 20