UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


DIANNE MARLON,                    )
    Plaintiff,                )
                         )     CIVIL ACTION NO.
      v.                      )     01-12199-DPW
                         )
WESTERN NEW ENGLAND COLLEGE, )
    Defendant.                )


MEMORANDUM AND ORDER
December 9, 2003


Plaintiff Dianne Marlon was formerly a student at the law school of defendant Western New England College ("College"). She brings this action in three counts, alleging that the College failed to reasonably accommodate her disabilities in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.; the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Massachusetts Equal Rights Act, Mass. Gen. Laws ch. 93 § 103. Before me is defendant's motion for summary judgment on all three counts, which I grant.

## I. BACKGROUND

### A. Facts

Unless otherwise noted, the parties do not dispute the following facts. After working more than fifteen years as a

paralegal in a variety of legal fields, Marlon applied to, and was admitted by, the College's School of Law ("School of Law").  She began her studies at the School of Law in August 1999.

 On October 23, 1999, Marlon went to the Family Medical Center complaining of pain in her right shoulder.[1]  On October 25, 1999, Marlon visited Dr. Stephen A. Dean, a chiropractor, complaining of pain in her neck and right shoulder and numbness in her right arm. Dean advised Marlon to receive 6-12 "chiropractic adjustments" over the following several weeks as treatment for her pain, to improve her limited range of motion, and to stabilize her physical condition.

On November 5, 1999, Dean sent a letter to Arthur Leavens, Associate Dean of the School of Law, indicating that Marlon had secured his services as of October 25th, and that because of her injuries, he had advised Marlon to consider lessening the strain on her hand by reducing her classload.  Marlon completed a change of status form on around November 10, 1999, requesting a change from full-time to part-time status.  Leavens sent Marlon a letter on November 17, 1999 notifying her that her request had been granted for the 1999 fall semester.  The change in status reduced Marlon's class load from six to four classes.

On November 29, 1999, Marlon returned to the Family Care

----

[1]The handwriting on the doctor's report is unclear, but Marlon states that she was prescribed indomethacin at the visit.

2

Medical Center for treatment for anxiety and depression,[2] and she returned again on January 18, 2000, for a follow-up visit.  Marlon continued to receive treatment from Dean through the school year.

Although she passed her interim examinations,[3] Marlon's final grades for her courses did not meet the school's established academic standards.[4]  In a letter dated June 29, 2000, Leavens stated that Marlon was no longer eligible to continue her studies at the School of Law, and he described the procedures by which she could petition for reinstatement.

On around July 11, 2000, Marlon meet with Bonni Alpert, the College's Director of Student Disability Services ("SDS").[5]  After reviewing the medical records and documents Marlon showed her, Alpert

---

[2]Again, the report is unclear, but Marlon stated in her answers to interrogatories that she was prescribed Paxil.  In her answers, she indicated that this visit occurred on October 27, 1999, but the report indicates otherwise.

[3]Marlon also has stated that in a letter dated June 14, 2000, Marlon's lawyering process class professor, Beth Cohen, recommended Marlon for Law Review and Moot Court.

[4]In her contracts, lawyering process, civil procedure, and tort classes, Marlon received final grades of 63, A-, 69, and 69, respectively, which resulted in a overall grade point average of 66.9.  The academic standards for the School of Law state that "[a] student will be dismissed for poor scholarship if the student's cumulative grade point average at the end of the spring semester of any academic year is less than 70.0."

[5]Marlon was referred to Alpert by the National Alliance for the Mentally Ill, which she contacted after learning about her final grades.

completed a form entitled "Faculty Notification of Student's Accommodations"[6] which stated that Marlon had "provided the College with the necessary documentation and has made requests that are consistent with Section 504 of the Rehabilitation Act of 1973 and the American's with Disabilities Act of 1990." It further stated that Marlon anticipated "needing the following accommodation(s) in your class: extended time on tests, distraction free environment." Additionally, the following note was handwritten: "Also, a note-taker in class + the use of voice recognition software for exams and papers."

On around July 12, 2000, Marlon submitted a petition for an exception to the rules for academic dismissal. In her petition, she stated that she possessed the required ability to complete the study of law, and she also described "extraordinary circumstances" beyond her control to explain why her grade deficiency was not due to lack of ability or failure to apply herself to the study of law. As part of these circumstances, she wrote:

> I was doing fine until approximately October when I started to have problems with my writing hand and arm. One night, I woke with a hot poker like pain running through my right shoulder and down my arm to my wrist and hand. It had gotten to the point that I was unable to mobilize my arm.

---

[6]There is no date on this form and no indication other than Marlon's allegations in her Complaint of when Alpert completed it. In its Answer, the College admitted that the form was filled out but stated that it had insufficient knowledge or information as to when it was filled out.

Finally, I made my way to the Family Health Clinic.  Dr. Geha saw me and prescribed anti-inflammatory drugs and suggested cortisone shots.  Nevertheless, after taking the medication, I choose [sic] an alternative treatment with a chiropractor, Dr. Dean, who used physical therapy and manipulation of the cervical.  On November 10, I petitioned for part-time status.  As Dr. Dean recommended, I need to reduce the stress on the hand and wrist.

Around November, I started to show additional physical symptoms of diarrhea, difficulty-making decisions, flushes in the face, and difficulty breathing.  On December 8, I presented myself with the symptoms to Dr. Geha who treated me for panic attacks by prescribing Paxil.  December 16 through 20, I took the midterms.  I received the following grades: 74 in Civil Procedure, 75 in Torts, and 60 in Contracts.  In hindsight, I should have asked for an accommodation for my hand.

. . .

I would respectfully request that I continue my law studies and work with Lawyering Process.  In August, I will be receiving the accommodations for my hand and the life events mentioned above have ended.  I am under a physician's care and responding to the medication.  If given the opportunity I will successfully complete the first-year required thirty-two credits with the required cumulative average of 70.0 or better.[7]

In a letter dated July 19, 2000, Professor James Gordon notified Marlon, on behalf of the Academic Standards and Student Petitions Committee, that she would be readmitted to the School of Law.  The letter stated that Marlon would have to repeat her first year courses, with the exception of the Lawyering Process course, and

---

[7]I have omitted internal references to attachments.  In the petition, Marlon also described other circumstances affecting her studies, including having to travel to Nevada to help her son with personal problems and the hospitalization of her husband.

that she would again be required to achieve a grade point average of at least 70.0.

On September 29, 2000, Marlon returned to the Family Care Medical Center, and after testing, Dr. Vijay Patel determined that she had some symptoms of carpal tunnel syndrome.[8]  Patel prescribed anti-inflammatory medication and also wrote a note that, under the heading "Remarks," stated: "Patient may use voice activated recorder during class.  She is to avoid consistent writing motion."  Under the heading "Recommendation," the note stated: "Writing breaks every 20 mins."

During the fall semester, the School of Law assigned a student to provide Marlon with notes, permitted her to use a tape recorder during classes and a school word processor for exams, and allowed her fifteen minutes per hour of rest period for exams.[9]  Marlon again

––––––––––––––––

[8]In her answers to defendant's interrogatories, Marlon stated that she had previously received treatment from Patel on June 27, 2000.  However, the report from the Family Care Medical Center indicates that the visit was another follow-up for anxiety and depression, and it is not clear from it whether Patel was the treating physician.  Marlon also indicated in her answers that she visited  Dr. Benjamin Liptzin on July 11, 2000 for treatment for depression and panic attacks and that she visited a Dr. Wynn Carpenter for psychological counseling on September 8, 2000.  The record indicates that Marlon had numerous visits with Carpenter and Liptzin for the remainder of 2000 and up through the fall of 2001.

[9]It is not clear from the record before me when the School provided the note-taker and made the allowances.  According to Marlon, Alpert issued the notification of accommodations in July, 2000.  However, in its statement of facts, the College states that it

passed her interim exams,[10] but she again did not achieve the required grade point average after her final exams.[11]  Leavens sent Marlon a letter on June 18, 2001 informing her that she was no longer eligible to continue studies in the School of Law.

On around June 22, 2001, Dr. Mark Elin, an assistant professor of psychiatry at Tufts University School of Medicine, performed a neuropsychological evaluation of Marlon at the referral of Dr. Benjamin Liptzin (see supra note 8).  After conducting a number of cognitive and neuropsychological tests, Elin wrote, in part:

> The patient has a specific learning disability in reading, math, and spelling.  This is a longstanding learning disability which has gone unnoticed.  The patient's visual spacial memory, linguistic learning weaknesses, attention/concentration problems, and problems encoding information together contribute to her longstanding learning disability.  She did have a serious accident when she was in the 6th grade, but to what degree this accounts for her present levels of cognitive functioning cannot be determined.  Following this accident, the patient reports that she was not evaluated for any cognitive or academic deficits.

---

did so in response to Patel's suggestion, and Marlon does not dispute that fact.  In a memorandum from Nancy Sykes, Assistant Dean for Law Student Affairs, to Marlon's file, Sykes noted that she and Marlon agreed as a "plan" that Marlon would tape classes, receive "15 min. for each hour of exam," and look into using a computer for exams.

[10]According to a grade report dated January 23, 2001, she received grades of 83, 78, and 72 in torts, contracts, and civil procedure, respectively.

[11]According to a grade report dated June 12, 2001, she received final grades of 66, 69, and 68 in torts, contracts, and civil procedure, respectively.

These findings can account for the patient's difficulties that she is experiencing in law school. She has been able to compensate for these deficits over the course of her training, however, in law school this will be more difficult because of the high level of integrative and analytic work that is required to do well on law school examinations.

After setting forth a number of recommendations, Elin concluded:

I believe that Ms. Marlon has significant learning disabilities which she has been struggling to compensate for over the years. This has lead to heightened levels of anxiety, frustration, depression, and low self-esteem. By identifying these problems, perhaps the school would be in a better position to accommodate to her learning situation in a supportive manner by helping her to remediate some of these deficits in her learning style. She can employ superior levels of cognitive functioning in her capacities to strategize nonverbal information. Within this domain, she is able to analyze, integrate, synthesize, and directly apply these cognitive strengths in a sophisticated manner.

On July 12, 2001, Marlon again petitioned for an exception to the rules for academic dismissal. In her petition, she claimed that she had "disabilities" within the meaning of both the Rehabilitation Act and the ADA: "I have been diagnosed with carpal tunnel syndrome and dyslexia, respectively, a physical impairment and cognitive deficit, both recognized by Massachusetts as ADA disabilities." Thus, in addition to her request to be reinstated, Marlon requested that the School of Law give her "reasonable accommodations." In an addendum to her petition, Marlon requested a number of specific "necessary accommodations," including: (1) double time and a distraction-free environment for exams, (2) use of a computer, (3)

tests scheduled at least two days apart, and (4) continued use of a note-taker.[12]  She also attached to the addendum Elin's "Neuropsychological Evaluation."  By letter dated July 30, 2001, the Academic Standards and Student Petitions Committee denied Marlon's petition "because [she] did not satisfy the criteria in [the] Academic Standards."

On December 14, 2001, Marlon brought this action in the District Court of Massachusetts alleging three counts.  Specifically, she alleges that the College discriminated against her in violation of the ADA and the Rehabilitation Act by failing to accommodate her disabilities.  She additionally contends that the College has, in failing to reasonably accommodate her, violated the Article 114 of the Massachusetts Constitution and Mass. Gen. Laws. ch. 93 § 103.

## B.   Procedural History

This case has taken a rather circuitous route, having been transferred by me from this [Eastern] division to the Western Division, ultimately to be returned.  When the case was originally filed in December 2001, it was assigned by random draw.  Marlon immediately moved to have the case transferred to the Western

---

[12]She also stated that she would "benefit from": papers rather than exams, multiple choice answer exams, counseling in test-taking skills, voice-activated computer, and extra rest times during examinations.

Division because the College was located there and Marlon by then resided out of state.  I granted the motion in accordance with Local Rule 40.1.  The case was then reassigned to Judge Freedman in the Western Division, and it proceeded through discovery and to a motion hearing on the College's present summary judgment motion.  Following Judge Freedman's unfortunate death after that hearing, and subsequent recusals by the other judicial officers in the Western Division, the case has been transferred back to me for ruling on the pending summary judgment motion and such further proceedings as might be necessary.  In ruling on the motion for summary judgment, I have had the benefit of the transcript of the motion hearing before Judge Freedman.

## II. DISCUSSION

**A.  Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law."  <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 52 (1st Cir. 2000), and a "genuine" issue is one that "may reasonably be resolved in favor of either

10

party." <u>Cadle Co. v. Hayes</u>, 116 F.3d 957, 960 (1st Cir. 1997).

**B.    ADA and Rehabilitation Act Claims (Counts I & II)**

Because the standards and definitions of the ADA and the Rehabilitation Act are, for present purposes, identical, <u>see Allison v. Dep't. of Corrs.</u>, 94 F.3d 494 (8th Cir. 1996); <u>Stone v. City of Mount Vernon</u>, 118 F.3d 92 (2d Cir. 1997), <u>cert. denied</u>, 522 U.S. 1112 (1998), and because the parties rely primarily on ADA case law, my analysis is framed in terms of the ADA but covers both federal claims.

Section 12112 of the ADA states that:

> [n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.[13]

42 U.S.C. § 12112.  The section further states that the term "discriminate" includes

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered

---

[13]The analogous provision in the Rehabilitation Act provides: No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.
29 U.S.C. § 794(a).

> entity can demonstrate that the accommodation would impose an
> undue hardship on the operation of the business of such covered
> entity.

42 U.S.C. § 12112(5)(A).

Marlon's argument and contentions concern primarily whether the
accommodations the School of Law afforded her were sufficient and
hence "reasonable" as required by the ADA and the Rehabilitation
Act.[14]  For instance, she contends that the accommodations provided
by the School of Law were not reasonable because the school refused
to allow her to use voice-activated computer software for her exams.
She further argues that the School of Law did not provide her a note-
taker until a month into the fall 2000 semester and stopped providing
notes near the beginning of the spring 2001 semester; that the notes
she received were insufficiently detailed; and that she should have
received a rest period rather than merely extra time for her exams.
In so arguing, however, Marlon moves too quickly past the threshold
issue of whether, in the first instance, she has a "disability" as
defined by the ADA and the Rehabilitation Act.

The ADA defines the term "disability" as: (A) a physical or
mental impairment that substantially limits one or more major life

_____

[14]Marlon has at various points hinted at the allegation that the
College unlawfully discriminated against her on the basis her
disabilities in denying her second petition for an exception to the
Academic Standards.  However, Marlon alleged in her complaint only
that the College discriminated against her by failing to provide her
with reasonable accommodations, and she has not directly raised
claims of discrimination on any other basis.

activities; (B) a record of such impairment; or (C) being regarded as having such an impairment.  42 U.S.C. § 12102(2).  While Marlon contends that she is disabled because her impairments substantially limit several of her major life activities and, alternatively, because the College regarded her as having such impairments, she has not adduced sufficient evidence to create a genuine issue of material fact as to either line of argument.  Thus, I find that as a matter of law she is not disabled under either the ADA or the Rehabilitation Act.  As a consequence, I do not reach the question of whether the College failed to provide reasonable accommodations.

(1)  *Substantially Limited in a Major Life Activity*

Marlon has identified four impairments from which she suffers: (1) a specific learning disability, (2) major depression, (3) panic attacks, and (4) carpal tunnel syndrome ("CTS").  Marlon contends that these four impairments substantially limit her in the major life activities of working and learning.[15]

Whether a condition is an impairment that substantially limits one or more of an individual's major life activities is determined in a three-step analysis.  Lebron-Torres v. Whitehall Labs., 251 F.3d

_____

[15]In her answers to interrogatories, Marlon identified a number of additional major life activities affected by her impairments: "learning, writing, typing, reading, thinking, concentrating, interacting with others, performing tasks, studying, and alternatively, working."  In her opposition to summary judgment, she focuses her attention on working and learning, and I accordingly do the same.

236, 239 (1st Cir. 2001).  The first step of the analysis concerns whether the impairments identified by Marlon constitute "physical or mental impairment[s]" as defined by the ADA.  Id.  The second step concerns whether the life activities that Marlon claims are affected by the impairments--working and learning--constitute major life activities under the ADA.  Id.  The final step ties the first two steps together in a determination of whether the impairments substantially limit the major life activities.  Id.

Drawing all inferences in her favor, Marlon satisfies the first two prongs of this analysis for summary judgment purposes.  According to the EEOC regulations,[16] a "physical or mental impairment" means:

(1)  Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2)  Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h).  The impairments Marlon alleges to have--a specific learning disability, major depression, panic attacks, and

---

[16]What level of deference to afford the EEOC regulations remains unclear.  See Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 194 (2002).  However, the First Circuit has relied on the regulations in conducting the first two prongs of the analysis, see Lebron-Torres, 251 F.3d at 240, and given the reliance of both parties on the regulations, I see no reason not to do the same.

CTS--fit fairly within these definitions.  Moreover, according to the EEOC regulations, "major life activities" are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  However, to survive summary judgment, Marlon must demonstrate that her alleged impairments substantially limit her in the major life activities of working or learning; otherwise her claim fails in the third step of the analysis.  See Lebron-Torres, 251 F.3d at 240.

While Marlon argued in her opposition brief that her CTS constituted a physical disability under the ADA and Rehabilitation Act, she apparently has abandoned the argument that it is such by virtue of substantially limiting a major life activity.  At the summary judgment motion hearing before Judge Freedman, Marlon's counsel was asked to cite "any preceden[ts] showing carpal tunnel syndrome to be a disability under the ADA or the Rehabilitation Act."  Marlon's counsel responded:

> [O]ur case is not carpal tunnel syndrome.  I don't have a case to cite for that.  Carpal tunnel syndrome may be a disability if it substantially impairs.  We don't believe that was the problem here.

> We believe that the problem here [is that] the school itself . . . admits that she is disabled and entitled to several accommodations which they never gave her.

Thus, Marlon apparently argues that her CTS constitutes a disability

under § 12102(2) of the ADA only insofar as the College regarded her as having the impairment. I consider that argument in a separate section below.

Aside from CTS, the only potential impairments that could substantially impair her in the major life activity of working are her alleged depression, panic attacks, and learning disability. Consequently, I consider in turn whether these impairments substantially limited Marlon either in working or in learning.

(a) <u>Working</u> – The First Circuit has recognized working as a potential major life activity under the ADA. <u>Gelabert-Ladenheim v. Am. Airlines, Inc.</u>, 252 F.3d 54, 58 (1st Cir. 2001); <u>Lebron-Torres</u>, 251 F.3d at 240. However, because there is "some conceptual difficulty in defining ‹major life activities' to include work," <u>Gelabert-Ladenheim</u>, 252 at 58 (quoting <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 492 (1999)), an ADA plaintiff claiming that her impairment substantially limits the major life activity of working "assumes a more fact-specific burden of proof," <u>Gelabert-Ladenheim</u>, 252 at 58 (quoting <u>Quint v. A.E. Staley Mfg. Co.</u>, 172 F.3d 1, 11 (1st Cir. 1999)), which stems from an "individualized inquiry" mandated by the ADA. <u>Sutton</u>, 527 U.S. at 483. For the purposes of summary judgment, this burden requires that the plaintiff offer evidence from which a reasonable jury could find that she is "significantly restricted in her ability to perform a class of jobs or a broad range

16

of jobs in various classes." <u>Lebron-Torres</u>, 251 F.3d at 240; <u>Sutton</u>, 527 U.S. at 492 ("If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs.  Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.").

A plaintiff's showing must be made at two separate levels: The first level focuses on the characteristics of the plaintiff-including education level, training, job skills, expertise, and knowledge. <u>Gelabert-Ladenheim</u>, 252 F.3d at 59.  The ultimate question at this level is what plaintiff's past and/or present work experience indicates about her current skills and abilities in the workplace, as compared with the "average person having comparable training, skills and abilities."  29 C.F.R. § 1630.2(j)(3)(i); <u>Gelabert-Ladenheim</u>, 252 F.3d at 60.  The second level concerns the relevant job market, in light of the plaintiff's particular individualized characteristics. <u>Id.</u>

Marlon has not introduced any evidence specifying the kinds of jobs that her impairments prevented her from performing.  The burden of proof on an ADA plaintiff as to the number and types of jobs she can or cannot perform in the relevant labor market is "not onerous," <u>id.</u> at 62, and can be met using, for example, evidence from a vocational expert or publicly available-labor market statistics.  <u>Id.</u>

17

at 60-61.

Here, however, Marlon does little more than offer conclusory statements that her impairments substantially limited her ability to work. She has not produced any evidence that her impairments hindered her ability to perform either a class of jobs or a broad range of jobs in various classes, and both her pre- and post-law school work history belie the inference that they do so. See Sheehan v. City of Gloucester, 321 F.3d 21, 25 (1st Cir. 2003) ("[I]t is enough to note that [plaintiff] continued to work for 24-32 hours per week as a security guard for us to determine that [his] physical impairment simply did not preclude him from a substantial class of jobs."); Gelabert-Ladenheim, 252 F.3d at 61 (plaintiff's post-impairment work history was "at odds with her conclusory claim that she [was] substantially limited in her ability to work"); Lebron-Torres, 251 F.3d at 241 (noting that plaintiff continued to work after her medical leave).

Before beginning law school, Marlon worked for fifteen years as a paralegal for at least eight different law firms of varying sizes and worked in, from her own description, "a number of complicated legal fields, including complex litigation and medical malpractice." Since leaving law school, Marlon has continued to work full time as a

18

paralegal.[17]

Drawing all inferences in favor of Marlon, her impairments were the root cause of her academic inadequacies in law school and have limited her potential ability to work as a lawyer. However, "[t]he inability to perform a single, particular job" does not constitute the required substantial limitation, Gelabert-Ladenheim, 252 F.3d at 60 (quoting 29 C.F.R. § 1630.2(j)(3)(i)), and moreover, she has not offered any evidence that her impairments restrict her from obtaining a legal degree at a different law school.

In short, Marlon has not shown how the restrictions imposed by her impairment substantially limit her ability to work in the area she lives given her education, training, skills, abilities, and employment history. Accordingly, I find that she has not sufficiently demonstrated that she is substantially limited in the major life activity of working.

(b) Learning - Marlon has similarly failed to tie her

---

[17]I note that at her present job, she claims to receive a number of accommodations such as voice activated software, a wrist rest for her keyboard, and a distraction-free work environment. Given that in her present work she receives the very accommodations she claims she should have received from the College, I note the conceptual difficulty in using the fact that Marlon presently works against her in determining whether she is disabled in the first instance. However, under Sutton, corrective or mitigating factors are to be considered in evaluating whether an individual is disabled. 527 U.S. at 488-89. Perhaps more importantly, Marlon has adduced no evidence that she could not work as a paralegal without the accommodations she presently receives.

impairments to an inability to learn.  While Elin's

neuropsychological evaluation[18] documents a "specific learning

disability in reading, math, and spelling," Marlon cannot rely

solely on evidence of a medical diagnosis of her impairments to

show she is disabled.  <u>Toyota Motor Mfg., Kentucky, Inc. v.

Williams</u>, 534 U.S. 184, 198 (2002).  Rather, the ADA requires

those "claiming the Act's protection . . . to prove a

---

[18]I note that even by Marlon's admission, the College did not
have notice of Marlon's learning disability before it received Elin's
evaluation with Marlon's second petition.  To be liable under the ADA
and Rehabilitation Act, the school must have known or been reasonably
expected to have known that Marlon was disabled.  <u>See</u> <u>Wynne v. Tufts
Univ. Sch. of Med.</u>, 976 F.2d 791, 795 (1st Cir. 1992) (Rehabilitation
Act), <u>cert. denied</u>, 507 U.S. 1030 (1993).  Marlon contends that in
her meeting with Alpert, she turned over medical records which put
the College on notice of her CTS and psychological problems.  She
further argues that, following her meeting with Alpert, the College
should have initiated the informal, interactive process required by
the ADA which would have revealed that Marlon has a specific learning
disability.  Apart from being highly speculative, Marlon's argument
misconstrues the idea behind the interactive process.  While
the EEOC regulations state that it may be necessary "for the
covered entity to initiate an informal, interactive process
with the qualified individual with a disability in need of the
accommodation," 29 C.F.R. § 1630.2(o)(3); <u>see also</u> <u>Taylor v.
Phoenixville Sch. Dist.</u>, 174 F.3d 142, 157 (3d Cir. 1999), the
point of undergoing such a process would be to determine
appropriate accommodations for a known disability, not to
identify undiscovered disabilities.  Thus, I find that
Marlon's requests for accommodations for CTS did not put the
College on notice of her learning disability, and therefore,
even if she could demonstrate that her learning disability
substantially limited a major life activity (as set forth
below I find she has not), the learning disability could not
properly serve as the basis for her ADA or Rehabilitation Act
claims.

disability by offering evidence that the extent of the
limitation [caused by their impairment] in terms of their own
experience . . . is substantial."  Id. (quoting Albertson's,
Inc. v. Kirkingburg, 527 U.S. 555, 567 (1999)).  That the ADA
defines disability "with respect to an individual" makes clear
that Congress intended the existence of a disability to be
determined in such a case-by-case manner.  Toyota, 534 U.S. at
198.

      In his evaluation, Elin notes that Marlon's learning
disability is "longstanding" and that Marlon has "been
struggling to compensate for [the learning disability] over the
years."  Before Marlon began law school, she had been
successful in both her academic and professional careers.  She
received a B.S. from Arizona State University in criminal
justice and worked as a paralegal for a number of firms in a variety
of fields.  She has not produced any evidence that her learning
disability hindered her performance before she began law school, and
in fact, she claims that the learning disability primarily affected
only one aspect of her law school performance: her ability to take
the long examinations.  At the motion hearing, Marlon's counsel
stated: "her difficulty was not in her legal skills, since she was
recommended for law review; was not in her taking of short exams,
since she succeeded in the midterms; but was in taking these long

final examinations, which is characteristic of somebody with a specific learning disability."  Similarly, in her opposition brief, Marlon states that her impairments "prevented her from demonstrating her true capacity for legal reasoning during four hour written exams."  A showing that her learning disability may have impaired her ability to achieve a score reflective of her ability on the final exams is much too narrow to meet the burden of demonstrating a substantially limitation in the major life activity of learning.

Marlon has not produced any evidence that her other alleged impairments, the depression, panic attacks, and CTS, limit--much less substantially so--her ability to learn.  While I might be able to infer from the evidence that the impairments affect her ability to learn to some degree, that is not enough to satisfy Marlon's burden under the ADA.  Thus, I find that Marlon's impairments do not substantially limit her in the major life activity of learning.

(2)  *Regarded as Having an Impairment*

Marlon's central argument that she is a disabled individual under the ADA stems from what she describes as the College's admission to that effect and "*prima facie* evidence of the need for . . . accommodations."  Specifically, she points to the "Faculty Notification of Student's Accommodations" letter from Bonni Alpert, director of the College's Student Disabilities Services, to Mary Van Houten of the School of Law.   The letter states:

22

> Dianne Marlon, a student enrolled in law school, has requested that we inform you of her disability and of the anticipated need for accommodation(s) in this class.
>
> This student has provided the College with necessary documentation and has made requests that are consistent with Section 504 of the Rehabilitation Act of 1973 and the American's with Disabilities Act of 1990.

Under subsection C of § 12102(2), an individual who is "regarded as having" a disability is disabled under the ADA.  42 U.S.C. § 12102(2)(C).  However, to fall within subsection C, one cannot merely be regarded as having _any_ impairment; rather, one must be regarded as having an impairment that constitutes a disability under subsection A--namely, "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C. § 12102(2)(A).  In other words, for an ADA plaintiff to be disabled under subsection C, the defendant "must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting."  Sutton, 527 U.S. at 466-67.

Here, while the letter recognizes Marlon's need for accommodations, it is a form letter that does not indicate that Alpert made any determination of whether Marlon had any impairments that substantially limited a major life activity.  Alpert testified in her deposition that she did not make an independent assessment of a student's disability at all, but rather spoke with the student and

23

reviewed the documentation the student gave her--for example, medical or psychiatric records--to determine whether the student would be at a disadvantage without the requested accommodations.  Thus, at most, the letter demonstrates that the College recognized Marlon's impairments and her need for accommodations. It does not indicate that the College regarded Marlon as having any impairment substantial enough to constitute a disability under the ADA.

The mere fact that an ADA defendant makes an accommodation is not evidence that it regarded plaintiff as having a disability. Mahon v. Crowell, 295 F.3d 585, 592 (6th Cir. 2002) (in following specific recommendations of plaintiff's treating physician by altering plaintiff's work requirements to take into account his injury, defendant was not regarding him as disabled); Thornton v. McClatchy Newspapers, Inc., 261 F.3d 789, 798 (9th Cir. 2001) ("[W]hen an employer takes steps to accommodate an employee's restrictions, it is not thereby conceding that the employee is disabled under the ADA or that it regards the employee as disabled."), clarified by 292 F.3d 789 (2001); Plant v. Morton Int'l, Inc., 212 F.3d 929, 938 (6th Cir. 2000) ("[Plaintiff] cannot show that [the "regarded as" provision] applies to him merely by pointing to that portion of the record in which his supervisor admitted that he was aware of [plaintiff]'s medical restrictions and modified [his] responsibilities based on them."). As the Ninth Circuit noted, a

"contrary rule would discourage the amicable resolution of numerous employment disputes and needlessly force parties into expensive and time-consuming litigation." Thornton, 261 F.3d at 798.

Marlon has offered no evidence to show that Alpert, in filling out the form, was doing anything more than recommending to the School of Law that it grant Marlon's request for accommodations. Nothing in the record leads me to infer that the form Alpert filled out was indication that Alpert or the College regarded Marlon as having an impairment that substantially limited any of her major life activities. Accordingly, I find that Marlon is not a disabled individual under subsection C of § 12102(2).

## C.    State Law Claim (Count III)

Marlon's ancillary state law claims arise pursuant to the Massachusetts Equal Rights Act, Mass. Gen. Laws ch. 93 § 103, and Article 114 of the Amendment to the Massachusetts Constitution. M.A. Const. amend. art. CXIV. She alleges, mirroring her allegations in her federal law claims, that the College discriminated against her by failing to reasonably accommodate her disabilities.

Title XV of the Equal Rights Act states that "[a]ny person within the commonwealth, regardless of handicap or age as defined in chapter [151B], shall, with reasonable accommodation have the same rights as other persons . . ., including, but not limited to, the rights secured under Article CXIV of the Amendments of the

25

Constitution."  Mass. Gen. Laws ch. 93 § 103(a).  Accordingly, Marlon's § 103 claims encompasses her constitutionally-based state law claim,[19] and the definition of "handicap" for the purpose the former claim is Mass. Gen. Laws ch. 151B, the Massachusetts antidiscrimination statute.

Chapter 151B's definition of "handicap" is virtually identical to the definition of "disability" in the ADA and the Rehabilitation Act.  Under chapter 151B, "the term handicap means (a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) record of having such impairment; or (c) being regarded as having such impairment."  Mass. Gen. Laws ch. 151B § 1(17).  Furthermore, the Massachusetts Supreme Judicial Court has adopted the same three-step analysis used by the First Circuit, see supra section II.B.1, to determine whether an impairment substantially limits a major life activity.  City of New Bedford v.

---

[19]Article 114 states: "No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth."  The Supreme Judicial Court of Massachusetts has held that "[i]f a violation of art. 114 rights can be redressed within the ambit of an existing statute, such as the State Civil Rights Act, there is a well-worn procedural path to relief for such a violation." Layne v. Superintendent, Mass. Corr. Inst., Cedar Junction, 406 Mass. 156, 159 (1989); see also Tate v. Dep't of Mental Health, 419 Mass 356 (1995) (Article 114 claim barred because a claim under Mass. Gen. Laws ch. 151B provided adequate relief to redress handicap discrimination in employment).  Thus, Marlon cannot separately bring both an Article 114 claim and a § 103 claim.

<u>Mass. Comm'n Against Discrimination</u>, No. SJC-08885, 2003 WL 22838789, at *6 (Mass. Dec. 2, 2003). In <u>City of New Bedford</u>, the Supreme Judicial Court also adopted the federal standard that applies specifically to the major life activity of working: "[a]n impairment substantially limits an individual's ability to work if it prevents or significantly restricts the individual from performing a *class of jobs* or *a broad range of jobs* in various classes." <u>Id.</u> at *7 (emphasis in original).[20]

Given these parallels between the ADA and the Rehabilitation Act, on the one hand, and § 103 and chapter 151B, on the other, Marlon's state law claims are subject to the same disposition as her federal claims. For the same reasons, outlined in detail above, that Marlon has not sufficiently demonstrated she has a "disability" for the purposes of her federal law claims, she has not sufficiently shown that she has a "handicap" as defined by chapter 151B. I therefore find that her state law claims in Count III fail as a matter of law and accordingly dismiss them.

---

[20]Similarly, the court held that "[a]n employee is 'regarded as' having a 'substantial limitation' on the major life activity of 'working' only if his perceived impairment precludes him from performing a class of jobs." <u>City of New Bedford</u>, 2003 WL 22838789, at *6. Massachusetts courts have not had occasion to analyze specifically the standard that applies to the major life activity of learning, but there is no reason for concluding that they will approach it differently than I have in Section II.B.(1)(b), <u>supra</u>.

27

## III. CONCLUSION

For the reasons set forth more fully above, defendant's motion for summary judgment is GRANTED as to all counts.


                                        /s/ Douglas P. Woodlock
                                        _____
                                        DOUGLAS P. WOODLOCK
                                        UNITED STATES DISTRICT JUDGE